Annie TYSON et al.

v.

Nicholas NORTON, Individually and as Commissioner of the State of Connecticut Welfare Department, et al.

Civ. No. H-74-95.

United States District Court,
D. Connecticut.

Feb. 24, 1975.

Marilyn K. Katz, and Ira Horowitz, Bridgeport Legal Services, Inc., Bridgeport, Conn., Charles A. Pirro 3rd, Norwalk Legal Services, Inc., South Norwalk, Conn., James C. Sturdevant, Tolland-Windham Legal Assistance, Rockville, Conn., for plaintiffs.

Edmund C. Walsh, Asst. Atty. Gen., Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

This case is a multi-pronged attack upon the administration of the Food Stamp program in the state of Connecticut. At stake is the very ability of thousands of low-income households in this state to obtain for themselves the means for affording a nutritiously adequate diet. As both the cost of food and the rate of unemployment climb during the depression we are suffering in this normally prosperous state, it must be apparent that the need for an effective, efficient and humanely operated food stamp program is becoming ever more imperative. Plaintiffs challenge the effectiveness of the program as currently administered, contending that in a variety of ways the defendants are violating both the letter and spirit of the Food Stamp Act, 7 U.S.C. §§ 2011–2025 (1970), and the regulations and instructions promulgated thereunder by the Food and Nutrition Service (FNS) of the Department of Agriculture, the federal agency charged with overseeing the operation of the food stamp programs in the various states.

After listening to three days of testimony and examining numerous briefs, affidavits, deposition transcripts and exhibits submitted by the parties, this court has become convinced that there are serious deficiencies in the manner in which the state is operating its food stamp program. While there are often external factors beyond the control of any government agency which may account for inadequate administration of a program, the inadequacy in this case

seems to be explainable in terms of foot-dragging efforts somewhat more noticeable than a simple lack of enthusiasm. By so limiting its efforts, the defendants have acted in derogation of the purpose of the Food Stamp Act, best articulated in the congressional declaration of policy at 7 U.S.C. § 2011 (1970):

"It is hereby declared to be the policy of Congress, in order to promote the general welfare, that the Nation's abundance of food should be utilized cooperatively by the States, the Federal Government, local governmental units, and other agencies to safeguard the health and well-being of the Nation's population and raise levels of nutrition among low-income households. The Congress hereby finds that the limited food purchasing power of low-income households contributes to hunger and malnutrition among members of such households. The Congress further finds that increased utilization of food in establishing and maintaining adequate national levels of nutrition will promote the distribution in a beneficial manner of our agricultural abundances and will strengthen our agricultural economy, as well as result in more orderly marketing and distribution of food. To alleviate such hunger and malnutrition, a food stamp program is herein authorized which will permit low-income households to purchase a nutritionally adequate diet through normal channels of trade."

The Food Stamp Act was passed in 1964 and was designed to operate in a relatively simple manner in order to insure that all needy households would receive food stamps. At the national level the program is administered by the Food and Nutrition Service of the Department of Agriculture. It is charged, *inter alia,* with establishing national eligibility standards, including income and work requirements. 7 U.S.C. § 2014 (b), (c), (d) (1970). It is worth noting that states have a choice as to whether they will participate in the food stamp program. But once the decision to participate is made, a state is bound to follow the requirements of 7 U.S.C. § 2019 (1970) which provides, *inter alia,* that the state is charged with the responsibility of certifying eligible households. Moreover, the state, pursuant to 7 U.S.C. § 2019(e), must submit a plan of operation to the FNS for its approval. The financial burden imposed upon the state is almost de minimis. Not only does the federal government pay for 100% of the benefits received by the participants, it will also reimburse the state for 50% of the cost of administering the program. Food Stamp Reg. § 271.2, 40 Fed.Reg. 1887 (1975). Connecticut has elected to participate in the food stamp program and thus has subjected itself to the requirements of the federal statute and regulations in operating its program.

The scheme itself is simple. Eligible households may purchase stamps at less than their face value. The number of stamps which they are entitled to purchase and the amount which they must pay for them is determined on the basis of nationally established standards. The amount which they must pay is called the "purchase requirement." Food Stamp Reg. § 270.1(qq), 40 Fed.Reg. 1883 (1975). The difference between the face value of the stamps and the "purchase requirement" is referred to as the "bonus." In many states, including Connecticut, the participating households are not issued food stamps directly by the issuing agency (in Connecticut, the Department of Welfare, *see* Conn. Gen.Stat.Ann. § 17–12a (Supp.1974) ). Rather, they are given an Authorization to Purchase (ATP) card which states on its face the amount that the household is entitled to purchase and the "purchase requirement." The participating householder then takes the card to a bank and buys the food stamps. These stamps are acceptable at their face value at participating food stores and, in some cases, participating dining facilities.

Plaintiffs in this case are a number of food stamp eligible Connecticut citizens who have experienced a variety of diffi-

culties in either making their initial application or during the course of their participation in the food stamp program. Their complaint raises several issues on behalf of themselves and the classes which they seek to represent in this action: (1) the state has failed to meet its obligation to "undertake effective action . . . to inform low-income households concerning the availability and benefits of the food stamp program and insure the participation of eligible households." 7 U.S.C. § 2019(e)(5) (1970); (2) the state has failed to allow applicants to apply for food stamps when they first express a desire to apply and has imposed great burdens upon applicants by refusing to conduct telephone interviews and only providing home interviews under rare circumstances; (3) the state fails to process applications within the 30-day period required by law; (4) the state has failed to grant *automatic* forward adjustments for those persons whose applications are not processed within 30 days; (5) the state has failed to provide immediate emergency authorizations to applicants with zero purchase requirement; (6) the state has failed to provide immediate certifications for households on general assistance; (7) the state has failed to provide ATP cards prior to the next issuance date for those households whose ATP cards are either lost, stolen, rendered unusable or not mailed through administrative error; (8) the state has failed to implement a variable purchase option plan that conforms to federal standards; (9) the state has failed to implement a program to provide for 60-day continued certification for those persons who move within the state; and

(10) the state is violating the plaintiffs' rights to equal protection of the law by refusing to provide benefits from the date of application, rather than the date on which an application is approved.

### Preliminary Matters

There are several preliminary matters which must be considered before proceeding to the merits. First, although the defendants have not challenged the jurisdiction of this court, the plaintiffs have extensively briefed the issue and argued that any one of a number of bases exist for jurisdiction. It is not necessary to discuss the issue in detail, because 28 U.S.C. § 1337 (1970) provides a jurisdictional basis for this action.

■ That provision grants original jurisdiction to the district courts "of any civil action or proceeding arising under any Act of Congress regulating commerce . . .." As one of the articulated purposes of the Food Stamp Act is to "strengthen our agricultural economy, as well as [to] result in more orderly marketing and distribution of food," 7 U.S.C. § 2011 (1970), it is clear that this action arises out of an Act of Congress which regulates commerce. Lidie v. State of California, 478 F.2d 552 (9th Cir. 1973); Bennett v. Butz, 386 F.Supp. 1059 (D.Minn.1974); Giguere v. Affleck, 370 F.Supp. 154, 157 (D.R.I.1974); Moreno v. U. S. Dept. of Agriculture, 345 F.Supp. 310, 312–313 (D.D.C.1972), aff'd, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

Second, the plaintiffs seek class certification of this action pursuant to Fed R.Civ.P. 23. Their proposed definition of the class is set out in the margin.[1]

---

1. "The members of the class are all those persons whose households are eligible for food stamps in the State of Connecticut and:

   a. who were not informed of the availability and benefits of the food stamp program, and were not encouraged to participate or did not in fact participate, or had difficulty in participating in the food stamp program;

   b. who were not allowed to apply for food stamps at the time they initially con-

   tacted the Welfare Department of their intent to apply for food stamps;

   c. whose incomes are so low that they have no purchase requirement and are therefore eligible to receive immediate authorization to purchase food stamps;

   d. who are federally-aided public assistance or general assistance recipients and who are therefore eligible to receive immediate authorization to purchase food stamps;

More accurately, they seek certification of a series of classes, each composed of all those who are aggrieved by the various policies of the defendants which are under attack in this action. The requirements of Rule 23(a) and (b)(2) have been satisfied in all but one instance. That exception involves a challenge to the alleged failure of the defendants to implement a 60-day continuing certification plan for those participating households who move within the state. For reasons that will be fully discussed *infra*, none of the named plaintiffs has standing to raise that issue and therefore there is no class representative. With regard to all other claims, the classes are hereby certified as defined by the plaintiffs. [2]

■ Finally, it is necessary to note the current procedural status of this litigation. The case was originally heard on the plaintiffs' motion for a preliminary injunction. However, it became apparent that the plaintiffs were not seeking a restraining order to preserve the status quo pendente lite, but rather were asking this court for mandatory injunctive relief which would require substantial changes in the administration of the food stamp program. That form of relief is not appropriate at a preliminary stage of the proceedings. *See* King v. Saddleback Junior College District, 425 F.2d 426 (9th Cir. 1970), cert. denied, 404 U.S. 979, 92 S.Ct. 342, 30 L.Ed.2d 294 (1971); Unicon Management Corp. v. Koppers Co., 366 F.2d 199 (2d Cir. 1966); Valentine v. Indianapolis-Marion County Building Authority, 355 F.Supp. 1240 (S.D.Ind.1973); United States v. Feature Sports, Inc., 348 F. Supp. 966 (S.D.N.Y.1969). Accordingly, the parties were given an opportunity to supplement the record with additional affidavits and documentation and agreed to permit this matter to go forward to a decision on the merits.

### The "Full Participation" Program

■ Title 7, U.S.C. § 2019(e)(5), a part of the 1971 amendments to the Food Stamp Act, *see* Act of January 11, 1971, Pub.L.No. 91–671, § 6(b), 84 Stat. 2048, introduced a brand new concept into the food stamp program. Beyond just making food stamps available, Congress required the states to take active steps to insure that the availability of this benefit ripened into realization for all eligible households. This "full participation" amendment provides "that the State agency *shall undertake effective action,* including the use of services provided by other federally funded agencies and organizations, *to inform low-income households concerning the availability and benefits of the food stamp program* and *insure the participation of eligible households.*" 7 U.S.C. § 2019(e)(5) (emphasis added). The plaintiffs maintain that the defendants have failed to satisfy this statutory mandate and look to this court for an order directing the defendants to expand and intensify their "full participation" efforts.

---

e. whose applications for food stamps are not acted upon within thirty days from the date of application and, for those determined eligible, who do not receive their benefits within thirty days from the date of application;

f. who are certified but do not receive their food stamp benefits from the date of application;

g. whose authorization cards are lost, rendered unusable, stolen, or not mailed through administrative error and are therefore eligible to receive authorization to purchase food stamps prior to the next regular issuance;

h. who requested or are nevertheless eligible for an election to purchase a fraction of any monthly food stamp coupon allotment;

i. who move their households and are therefore entitled to continuing certification for a period of sixty days;

j. who have not received their food stamp bonuses to which they are entitled through the procedure of forward adjustment." Plaintiffs' Complaint ¶ 4.

2. *See* note 5, *infra*.

## A.

Before considering the evidentiary underpinnings of this challenge, it is necessary at the outset to define the scope of a state's responsibility under 7 U.S.C. § 2019(e)(5). All parties are in agreement that, at a minimum, the statute requires effective action to *inform* low-income households of the availability of *food* stamp benefits. The plaintiffs, however, seeking to breathe some content into the statutory clause—"and insure the participation of eligible households"—, argue that the defendants must also take steps to minimize the application burden upon those already informed of the availability of food stamps. Burdensome application requirements, they argue, are inconsistent with the goal of *insuring* full participation. The defendants just as firmly maintain that the statute only requires efforts to inform persons of the program's existence.[3]

The defendants' watered down interpretation of the statutory mandate is supported by regulations and instructions issued by the FNS. Those regulations interpret this section of the statute, which FNS has called "outreach," as requiring only,

"Any communicative effort performed cooperatively or singularly by Federal, State, or local agencies and organizations, or by individuals, to inform low-income households of the availability and benefits of the program and to encourage the participation of eligible households." Food Stamp Reg. § 270.1(nn), 40 Fed.Reg. 1883 (1975). *See* FNS(FS) Instruction 732–6(III) (1971). Similarly, in another regulation, Food Stamp Reg. § 271.1(k), 40 Fed.Reg. 1886 (1975), the FNS severely weakened the statutory language of "insure the participation of eligible households" by providing that states need only "encourage" their participation.

Were this court to defer to the administrative construction of 7 U.S.C. § 2019(e)(5), the defendants' conception of their responsibilities would clearly prevail. Normally, "[w]hen faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Gulf Oil Corp. v. Hickel, 140 U.S.App.D.C. 368, 435 F.2d 440, 444–445 (1970). However, "[c]ourts need not defer to an administrative construction of a statute where there are 'compelling indications that it is wrong.' Red Lion Broadcasting Co. v. FCC, 395 U.S. 367,

---

3. The May 30, 1974 deposition of defendant Cecil McCarthy, director of the state food stamp program, contains the following colloquy:

"Q. Isn't it correct that that federal regulation 271.1 sub-paragraph k requires that the state shall take effective action to do two things: one, to inform low income households of the availability and benefits of the program; and two, to encourage their participation?

"A. Yes.

"Q. Is there, then, a difference between 'informing' low income households and 'encouraging' the participation of low income households?

"A. No, what difference . . . well you inform them. Here it is, you know, come and see us. The worst we can say is no, so . . .

"Q. Is that not simply informing them?

"A. Informing them and encouraging them.

"Q. What steps are specifically taken to encourage participation? Are not those activities you described which you previously described just for the purpose of informing people?

"A. No, informing them and encouraging them to . . . participate in the program.

"Q. How does merely telling people about the availability of the program encourage their participation?

"A. Well the same way in which you tell people about your product in hopes of selling it. Salesmenship. It's a sales job, and it is a sales job. The biggest thing I have to overcome is that most people think that this is welfare, and they don't want welfare." *Id.* at 125–126.

The plaintiffs' attorney in his questioning relied upon the word "encourage" in the regulation, see *supra*, whereas they now, quite correctly, base their claim upon the statutory language which is "insure."

381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) . . . ." Espinoza v. Farah Mfg. Co., 414 U.S. 94–95, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973); *see* R. V. McGinnis Theatres & Pay T.V., Inc. v. Video Independent Theatres, Inc., 386 F.2d 592 (10th Cir. 1967), cert. denied, 390 U.S. 1014, 88 S.Ct. 1265, 20 L.Ed.2d 163 (1968); Government of Guam v. Koster, 362 F.2d 248 (9th Cir. 1966); Hometrust Life Ins. Co. v. United States Fidelity & Guaranty Co., 298 F.2d 379 (5th Cir. 1962). "Administrative regulations cannot be allowed to distort plain and obvious statutory language." Hoover v. United States, 348 F.Supp. 502, 505 (C.D.Cal.1972). In this case the clear and obvious language of the statutory mandate with which the defendants are bound to comply is being distorted by administrative regulations.

■ In Bennett v. Butz, *supra,* the court was faced with a challenge, not to the adequacy of any individual state's "full participation" program, but rather to the sufficiency of the FNS's efforts to insure the compliance of all participating states with the statutory requirement. Upon reviewing the statutory history of the Food Stamp Act and the considerations which led to strengthening the Act's purpose by adding the "full participation" provision, a review which need not be repeated here, the court concluded:

"The statutory outreach[4] mandate reflects Congressional concern with token participation in the food stamp program. The statute uses strong language. Outreach efforts are to entail 'effective action' not only to inform poor people of the program's benefits but also to 'insure' their participation. 7 U.S.C. § 2019(e)(5)." 386 F.Supp. at 1065 (footnote not in original).

The court thus properly emphasized that the statutory mandate is expressed in the conjunctive; there are two elements to it, a state's program must both "inform" *and* "insure" participation. The plain language of the statute resists the efforts of both the FNS and the defendants to equate these two obligations and reduce a "full participation" program to solely a communicative effort. While informing low-income households of the availability of food stamp benefits is clearly a prerequisite to insuring the full participation of eligible households, a state has not fully satisfied its obligations by merely imparting such information. It must then take further steps to insure that those who are eligible actually apply for benefits and receive them with dispatch. Although the state obviously cannot force eligible households to participate, it can and must operate a food stamp program which actively *insures* participation by placing as few obstacles as possible in the way of those applying for benefits. A failure to do so would be as serious a violation of 7 U.S.C. § 2019(e)(5) as a failure to undertake an information imparting program.[5]

---

4. Judge Lord used the term "outreach" in referring to the statutory language. That term, however, is not used in the statute, but rather was coined by the FNS to refer to an information program only. I have chosen to use the term "full participation" program to describe the statutory mandate, while reserving the term "outreach" for the informing element of a "full participation" program.

5. Although never made a part of the record, the defendants, in a chambers conference, argued that none of the plaintiffs were any longer aggrieved by the defendants' alleged failure to implement an adequate "full participation" program and thus lacked the requisite standing to raise that claim. They maintained that as all of the plaintiffs had either applied for or were receiving food stamps, the issue was moot as to them; they no longer needed to be informed about the program nor was there any longer a need to insure *their* participation.

To argue that because the named plaintiffs knew about the availability of food stamps and were receiving them when the suit was begun they should not be permitted to litigate the issue of whether the defendants are complying with the statute's mandate to "inform" and "insure" participation would mean that no one could ever do so. It is obvious that any poor person who might bring such a suit must have known about the availabili-

## B.

The informing and insuring elements of a full participation program are largely complementary and both necessary for an effective food stamp program. As a prelude to a consideration of these separate elements, it will be useful to take a grandstand view of what has been accomplished and observe the extent to which there has been a shortfall in achievement of the statutory goal of full participation.

The statistical information which the parties have provided indicates that a large percentage of eligible households are not receiving food stamps in this state. Although this court does not

have before it recent official statistics, the plaintiffs, at the hearing, did present a report of the Community Nutrition Institute, a "public interest" organization, which revealed that as of January 1974 the percentage of eligible households in Connecticut participating in the food stamp program was 43.9%. At that point in time, the national average was 39.2%.[6] 4 CNI Weekly Report, No. 20 (May 16, 1974).

Since that time, there are indications that the percentage may have improved. In January 1974, the total number of participants in the state was 128,378. By June 1974, that number had increased to 138,567.[7] FNS, Statistical

---

ty of stamps before he commenced it. The defendants overlook the fact that this is a class action brought by plaintiffs in their own behalf and in behalf of other eligible persons "who were not informed of the availability and benefits of the food stamp program, and were not encouraged to participate . . . ." Even if the case is moot as to these particular plaintiffs, there is not the slightest doubt that there are other members of the class who are still aggrieved and thus the action may continue as a viable one. The same argument was rejected in Conover v. Montemuro, 477 F.2d 1073, 1085 (3d Cir. 1973) (rehearing en banc) (concurring opinion of Adams, J.) :

> "Whichever contention is pressed—mootness or standing—each is predicated, in this particular case, on the ground that this suit, looking solely to future relief, is not properly maintainable since the named plaintiffs have suffered only a past wrong. These arguments are without merit to the extent they overlook that this suit is a class action, as the district court permitted, on behalf of 'all juveniles in Philadelphia, Pennsylvania, who have been or will be affected by action of the defendants alleged in the complaint.' "

Cf. Sosna v. State of Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) ; Johnson v. New York State Education Dept., 409 U. S. 75, 79 n. 7, 93 S.Ct. 259, 34 L.Ed.2d 290 (1972) (Marshall, J. concurring) ; Rivera v. Freeman, 469 F.2d 1159, 1163 (9th Cir. 1972) ; Gatling v. Butler, 52 F.R.D. 389, 394–395 (D.Conn.1971). Even if this were not a class action, the defendants' argument is not necessarily persuasive. See Bennett v. Butz, supra; see generally Note, The Mootness Doctrine in the Supreme Court, 88 Harv.L.Rev. 373 (1974).

6. These statistics were derived from comparing the number of food stamp participants

with the number of households in the state with incomes of 125% of the poverty line, the income limit at the time for most household sizes. The former statistic was obtained from official Department of Agriculture figures and the latter was based upon the 1970 census.

7. While these statistics might be indicative of a trend, this court is hesitant to place too much reliance upon them. As is frequently the case, statistics can be shaped to support either side of an argument. In this case the plaintiffs point to the fact that in July 1971 the total number of food stamp participants in Connecticut was 140,528, approximately 2,000 more than in June 1974, a decrease of 2% over a two-and-one-half-year period. During the same period, the national figures reflected an increase in participation from 10,420,090 in July 1971 to 13,480,185 in June 1974, an increase of approximately 30%. Plaintiffs argue that this difference is a measure of the failure of the state's efforts to satisfy their "full participation" responsibilities.

The defendants, on the other hand, focus upon the recent changes in participation statistics. In January 1974, the number of Connecticut participants was 128,378 whereas in June 1974 the number had increased to 138,567, an increase of approximately 8%. During the same period the national figures reflected a change from 13,067,545 in January to 13,480,185 in June, an increase of only 3%. The defendants, of course, argue that this indicates the recent success of their "full participation" efforts. Looked at from the other side, however, it indicates the greater success which could be achieved were the state to intensify what this court finds to be its very meager "full participation" program, see infra.

Summary of Operations, June 1974. In addition, monthly reports being submitted to the plaintiffs and the court by the defendants indicate that over the past six months the number of food stamp applications of persons who are not receiving public assistance [8] has increased from 3,417 in July 1974 to 4,384 in December 1974, an increase of approximately 28%. During that same period, the number of applications approved per month has increased from 2,375 in July to 3,106 in December, an increase of approximately 31%. [9]

■ However, as set out in notes 7 and 9, *supra*, these figures are not a reliable guide to any change in the percentage of eligible persons participating in the food stamp program. On balance, the statistics indicate that there is still an unfortunately large number of eligible households in the state who must still be informed of the availability of food stamp benefits or whose participation in the program must still be insured.

### "Outreach"

Because of their limited conception of their "full participation" program obligations, the defendants have only drafted and implemented a plan to inform low income households of the availability of food stamps. That plan, which will be referred to as "outreach," [10] is formally set out in an amendment to their State Plan of Operation, submitted to the FNS for approval on September 17, 1973. Under FNS(FS) Instruction 732–6(V) (1971) the defendants were actually required to have submitted that amendment by January 24, 1972. This one-and-one-half-year delay in even drafting their "outreach" program is perhaps indicative of the low priority accorded it by the state.[11]

■ A reading of that plan, which was approved by the FNS,[12] reveals that

---

**8.** As will appear *infra*, the state processes the food stamp applications of persons receiving or applying for public assistance separately from the applications of those not participating in such programs. The defendants by agreement with the plaintiffs have undertaken, during the pendency of this law suit, to submit monthly statistics regarding the processing of the so-called "non-P.A." applications.

**9.** Again these statistics are not necessarily indicative of any change in the percentage of eligible persons participating in the food stamp program. The court takes judicial notice of the fact that the unemployment rate in the state has also sharply increased during the period in question. Statistics obtained from the Connecticut Department of Labor reveal that in July the unemployment rate in the state was 7%. That figure and those for other summer months were swollen by including in the category of the unemployed those persons on summer vacation who were not receiving vacation pay and therefore were eligible for unemployment compensation. The change in the state's employment situation is better gauged by a comparison of the October unemployment statistic of 5.6% with that of 7.1% for December 1974. This represents an increase of 27% in the rate of unemployment. During that same period the number of non-public assistance applications, *see* note 8, *supra*, *decreased* by approximately 11%. In fair-

ness to the defendants, it should be noted that the number of applications approved in December was 16% greater than in October. However, the statistics do indicate the existence of a large number of recently unemployed persons in the state who are not applying for food stamp benefits.

**10.** *See* note 4, *supra*.

**11.** In Bennett v. Butz, *supra*, Judge Lord found that as of the end of fiscal year 1973 only nine states had failed to implement an outreach program. Clearly, Connecticut was one of this small minority.

**12.** The fact that the FNS approved the state outreach plan is not indicative of the sufficiency of the program under the minimal standards of the FNS Instruction. In Bennett v. Butz, *supra*, the court, in reviewing the sufficiency of FNS's outreach efforts, found that "virtually all of the outreach plans submitted [and approved by FNS] reflect deficiencies which, in the absence of evidence to the contrary, this Court concludes represent clear and substantial non-compliance with the statute." 386 F.Supp. at 1066. In the face of this judicially recognized failure of the FNS to comply with the statutory "full participation" directive, this court does not accord the FNS determination with regard to the adequacy of the defendants' outreach plan the deference which is normally due to administrative action.

the state has failed to satisfy even the formal requirements of FNS(FS) Instruction 732–6.[13] For example, the FNS Instruction requires the state to describe the "methods to be used, on a continuing basis, in monitoring and evaluating the State and local outreach efforts." FNS(FS) Instruction 732–6(V)(a)(2). The defendants' outreach program contains no·such provision. In addition, Instruction 732–6(V)(B)(1) requires the outreach plan to include:

"A timetable by which the State Agency shall develop and put into effect the plans to reach potentially eligible households. Indicate the degree of priority given to such factors as major ethnic groups, senior citizens, migrants, and others who reside in low-income areas where food stamp participation is low."

The section of the state's plan entitled "Priorities and Timetable" simply does not contain the required information.[14] As set out in the margin, that section is very general and demonstrates a lack of thought and concern for· satisfying the very minimal requirements imposed by the federal instructions.

█ Of course, compliance with the informing or "outreach" element of the federal "full participation" mandate must be measured not only by the extent to which the state "plan" satisfies formal requirements, but also by the degree to which the state has actually engaged in informational activities. From a consideration of the evidence in this case, it has become apparent that the state's efforts have been deficient. In fact, perhaps the most telling indictment of the program is suggested by the responses of defendant Cecil McCarthy, director of the state food stamp program, to questions posed during the course of a deposition:

"Q. So the only real outreach is done on an *ad hoc* basis whenever an opportunity arises?

"A. That's right.

"Q. There's no . . . there are no permanent ongoing activities as part of an outreach program?

"A. No."

Deposition of Cecil McCarthy 134 (May 30, 1974).

The record in this case amply supports defendant McCarthy's telling admission. As required by FNS(FS) Instruction 732–6, the defendants in December 1974 submitted to the FNS an annual report detailing the nature, scope and success of their outreach activities during the preceding year. The report contains a listing of all of the private organizations and outside agencies contacted during that year by food stamp program personnel. While beginning at a rather slow pace (only two contacts in November 1973), the number of contacts increased significantly by year's end (17 contacts in October 1974). A large majority of those contacts were undertaken personally by defendant McCarthy, the only individual whom the state plan indicated would be engaged in outreach activities. While this recent burst of per-

---

13. It is interesting to note that the *Bennett* court determined that most state outreach plans submitted for FNS approval at least conformed to the format required by the Instruction. Connecticut is apparently in the minority.

14. "The implementation of the Outreach Program will become effective October 1, 1973, contingent upon formal approval by the *Food and Nutrition Service*. Following the approval, State Welfare Department will compile and maintain listing of community groups, cooperative agencies and others who are actively engaged in outreach efforts.

"Also, the following activities will be undertaken on an ongoing basis to fulfill our Outreach goals:
a. Media appearances regarding new regulations
b. Notifications and bulletins to community agencies and referral workers concerning new regulations, emphasis on new tables of eligibility;
c. Talks and exhibits;
d. Bi-lingual service brochure including information on food stamps will be distributed in Spanish-speaking areas . . . ."

sonal activity by defendant McCarthy is impressive, it is clear that the scope of potential outreach activities is far beyond the ability of any one individual to undertake, particularly when that individual is also personally responsible for the general administration of the entire food stamp program.[15] Furthermore, on closer scrutiny it is apparent that some of the contacts listed by the defendants in their annual report bear little or no relationship to "outreach"; the defendants seem to have listed in their report all contacts with outside groups, even those not related to informing eligible households about the food stamp program.[16]

In addition, a large number of those contacts were with senior citizens' organizations with little apparent attention being given to other distinct target groups. While the defendants' efforts with regard to senior citizens is commendable, FNS(FS) Instruction 732–6 and the clear intent of the statute mandate outreach efforts among *all* eligible households. Finally, there is no indication in the report as to whether these contacts were initiated by the defendants or by the outside agencies or private organizations. Mr. McCarthy in his deposition testified that he actively

seeks the opportunity to speak before such groups. However, substantial documentary evidence, some of it submitted by the defendants, indicates that at least some, if not a good part, of these contacts were *not* initiated by the defendants.

The defendants also seem to have made minimal use of the media in their efforts to inform low-income families of the availability of food stamp benefits. Their annual report reflects this fact and excuses it as follows: "It must be pointed out that while media appearances appear light, the programs where we do appear have very large audience ratings."[17] Annual Outreach Report, § III at 8. A series of promotional "spots" were allegedly sent to television and radio stations in the state and in their report the defendants stated that "[i]t can be reported that nearly all stations used the material and early re-release is planned." *Id.* at 8–9. However, a survey undertaken, with the parties' approval, of the state's major television and radio stations, including the only "soul" and Spanish-language stations, revealed little or no public service or news coverage of the food stamp program. In addition, with the exception of one station, the coverage was general-

---

15. Federal regulations now provide that the federal government will reimburse the state for 50% of the cost of administering its outreach program. Food Stamp Reg. § 271.2, 40 Fed.Reg. 1887 (1975). At the time the defendants submitted their outreach plan to the FNS in September 1973, the applicable regulation, 7 C.F.R. § 271.2(a)(2) (1974), provided for reimbursement in the amount of 62½% for outreach activities. The defendants' plan provided that reimbursement would only be sought at that rate for 50% of defendant McCarthy's salary, and the defendants never even actually applied for that amount. The fact that the time of no other employee was allocated to outreach activities again indicates the defendants' very limited conception of the program.

16. For example, the report lists several meetings with administrative staff and branch managers of several banks, and one meeting with the plaintiffs' attorneys which has now been revealed to have been for the

purpose of taking defendant McCarthy's deposition.

17. As an example of this exposure, the report focuses upon a television editorial regarding deficiencies in the state's food stamp program and to which the defendants responded. Interestingly, that editorial contained the following comment:

"And at the same time, we would urge a real publicity campaign for the Food Stamp Program. Right now, McCarthy depends largely on public service announcements, his own lectures and occasional free advertising to inform the public about food stamps.

"We can't help wondering what the response would be if they were advertised as often and as widely as the State Lottery is." WFSB–TV Editorial, September 13, 1974.

The Commissioner of Welfare in his televised reply did not respond to this criticism and suggestion.

ly initiated by the station and not the defendants.[18] The fact that some stations have undertaken programming on their own initiative does not satisfy the defendants' outreach responsibilities, but rather indicates a media receptiveness of which the defendants could take advantage.

Finally, in terms of the *informing* element of the "full participation" requirement, the defendants indicate in their report that numerous informational pamphlets have been distributed throughout the state and that employees in the local welfare offices respond to numerous requests for information about the program. This contention has not been challenged by the plaintiffs. In addition, it appears that the defendants, to a limited extent, have used the services of at least some "other federally funded agencies and organizations," 7 U.S.C. § 2019(e)(5) (1970), in their "program," specifically through cooperation with the SSI "Operation Find" project. However, the true extent of the cooperation with this program or others is not indicated by the evidence.

### "Insurance"

The remaining challenges are directed to administrative practices as being unnecessary hindrances to the achievement of the goal of "full participation." The plaintiffs allege that eligible persons encounter considerable difficulties and delays in applying for food stamp benefits. Primary among these complaints is the delay encountered by persons in making their initial applications. Federal regulations provide that food stamp applications must be processed within 30 days of their receipt by the certification office. Food Stamp Reg. § 271.4(a)(3), 40 Fed.Reg. 1890 (1975). It is perfectly

clear that "the application may be completed in the certification office or may be submitted by mail." FNS, The Food Stamp Certification Handbook § 2121 at 13 (1974) (hereinafter referred to as "Handbook"). The defendants accept this policy and, in fact, have issued a directive to district directors containing the following provision:

"District Offices will mail or give application forms (W1301) to any household making a written or oral request for one. Such a household shall be told of our willingness to take and process the application at our District Offices or at our scheduled circuit locations to eliminate the delay that a mail operation entails. When a *mail* application is received in the District Office it shall be *immediately* examined for signature and address and if these appear, the application shall be *clearly* and *legibly* date stamped.

*"The 30 day limitations for this type of application runs from the date of the date stamp and not from the date of the applicant's signature."* Interdepartment Message, May 3, 1974 (emphasis in original).

The plaintiffs argue, however, that although the defendants are willing to mail applications to households, there is no policy directing local certifying officers to inform persons of this service. Rather, they assert, it is the general policy upon inquiry of prospective applicants to schedule an interview for the next date which the welfare office has available, often as long as a month later, at which time the applicant first completes his application. This results, it is alleged, in substantial and discouraging delays because the 30-day period for the

18. An example of these responses is the text of the following letter from the Public Service Director of WKND, the only "soul radio" station in the state and the obvious medium for informing the black community about food stamp benefits:
"In reference to your letter dated, January 8, 1975, regarding the Food Stamp Program, WKND's Public Service Department has not received any information from the State Department of Welfare, informing the public about Food Stamp Benefits. I can't speak for the News Department, only the Public Service Department. I've had no encouragement from any State Official to broadcast any material on Food Stamp Benefits."

processing of applications does not begin to run until the application is actually completed. The plaintiffs claim that applicants should be allowed and *encouraged* to complete their applications immediately upon inquiring about the program, either through the mail or in the certification office.

It is not denied by the defendants that there is currently no written policy issued to welfare workers directing them to *offer* to mail applications or provide them immediately to persons who walk into the certifying offices. *See* Deposition of Cecil McCarthy 13 (May 30, 1974). However, it is the defendants' position that this is the de facto practice.

The plaintiffs have shown numerous instances in which applicants were subjected to substantial delay. For example, plaintiff Annie Tyson went to the Bridgeport welfare office to apply for food stamp and AFDC benefits on February 13, 1974, and was prepared at that time to apply for benefits. However, she was told to return two weeks later to begin the application process. She was not informed of her right to start the 30-day processing period running by immediately completing an application. Similarly, plaintiff Ethel Williams telephoned the Manchester District Welfare Office on January 9, 1974, to apply for food stamps and AFDC benefits, but was given an appointment to report to the welfare office on January 29, 1974. She was not informed of the possibility of having the application mailed to her nor told the advantages of such a course of action. In addition to these and other individual instances of delay, the plaintiffs were able to demonstrate through the affidavit of Kevin Mahoney, Director of Social Services for the Town of Mansfield, that as of mid-October, persons in his town had to wait three to four weeks before being allowed to make application for food stamps.

On the basis of this evidence, it appears that although the defendants are willing to supply applications upon request and to permit immediate application, there is no official policy to encourage such early applications. In the absence of a request by the applicant to complete immediately an application either through the mail or in the certifying office, the defendants appear to prefer to delay submission of the application until a required interview can also be scheduled. This, of course, enlarges the time for the defendants to satisfy the 30-day certification requirement.

Another of the plaintiffs' complaints centers around the interview requirement itself.[19] Before an applicant may be certified for food stamp benefits, he or some authorized representative must be interviewed by a certification worker. The purpose for this requirement is set out in Handbook § 2122 at 21:

"The purpose of the interview is to establish, to the satisfaction of the EW, that the actual facts of the case are consistent with the statements on the application concerning household income and circumstances and to establish, subject to subsequent verification, whether or not the household is eligible for food stamp assistance. The only successful method of making such a determination is the use of investigative interview techniques to conduct a thorough and searching inquiry into household circumstances. Merely reviewing the application for completeness is no substitute for the investigative interview."

Federal regulations provide that such an interview may be conducted "in a personal contact in the office, in a home visit, or by a telephone call . . . ." Food Stamp Reg. § 271.4(a)(2)(ii), 40 Fed.Reg. 1890 (1975). However, FNS (FS) Instruction 732–1(II)(B)(2) plac-

19. An interview is required only of non-public assistance households. *See* Food Stamp Reg. § 271.4(a)(1) & (2), 40 Fed.Reg. 1890 (1975). Of course, an interview is conduct-

ed where a household first applies for both food stamps and federally-aided public assistance.

es some restrictions upon the use of telephone interviews. It provides:

"Persons who are *unable* to come into the office to be interviewed may be interviewed in a home visit or by telephone. When it is necessary to interview the applicant by telephone, the reason should be fully documented in the case file. Inconvenience to the applicant will not be sufficient reason for conducting the interview by telephone." (Emphasis in original)

In addition, Handbook § 2122 at 21, adds that "[n]o household shall be interviewed by telephone for any two successive certifications without a face-to-face interview in the office or at home."

The defendants have admittedly adopted a far more restrictive policy than that allowed by the federal regulations and instructions. Telephone interviews are conducted under no circumstances and home interviews are conducted only where the applicant is elderly, housebound *and* living alone. Thus, persons like plaintiffs Thomas Burgess or Jayne Pierson, who are unable to travel to certification offices for interviews because of illness or injury, are not interviewed by telephone or at home, even though federal regulations would permit it. Similarly, no provision is made for individuals with pre-school children at home or those living considerable distances from certification offices with no available public or private transportation.

The defendants in May 1974 did initiate a "Food Stamp Circuit Rider" system under which a certification worker assigned to a district welfare office conducts interviews in outlying towns on a regularly scheduled basis for anywhere from one-half day to five days a week. While this system certainly does represent a step in the direction of *insuring* full participation by making the program more accessible to more citizens of the state, it is still not an adequate substitute for those unable to attend interviews even at these circuit riding locations. Moreover, as noted above, there

is evidence that this system is currently overburdened and unable in some communities to provide interviews within three or four weeks of an individual's initial inquiry concerning the program. Inevitably, this means that individuals are being referred to more distant offices with the attendant transportation difficulties which the circuit riding system was designed to avoid.

Finally, it does not appear that the harsh impact of the defendants' refusal to conduct telephone interviews is currently being ameliorated by any effort on the defendants' part to seek the assistance of outside agencies or organizations to provide transportation for applicants to certification offices. The possibility of such cooperation for this very purpose is even recognized in FNS(FS) Instruction 732–6(IV), but was never acted upon by defendants.

### C.

It is clear from a review of this evidence that the defendants have failed to comply with the requirements of 7 U.S.C. § 2019(e)(5). The statute in explicit terms requires the state to "undertake effective action . . . to inform low-income households concerning the availability and benefits of the food stamp program and insure the participation of eligible households." 7 U.S.C. § 2019(e)(5). Its purpose is to "safeguard the health and well-being of the Nation's population" by enabling "low-income households to purchase a nutritionally adequate diet" above the level of hunger and malnutrition. 7 U.S.C. § 2011. Although poverty may once have been considered an inevitable part of the human condition, the modern perspective is that it is a social problem to be eradicated, and the suffering of hunger and malnutrition, with the adverse effect which we know these have upon human health, is the core element of poverty.

While perfection in carrying out the program may not be obtainable, and arguments can be made to justify a failure to obtain one hundred per cent participation, perfection is not called for. The

statute requires the state to do what can be done. The controlling words in the statute are "effective action." The allocation of one man to undertake the task of informing the many thousands of eligible families living in poverty of the availability of food stamps is tragically inadequate. Viewed in perspective with the federal government's reimbursement of 50% of the state's costs, the expense of an adequate program would be insubstantial. If a small fraction of the cost of informing the state's citizens of the availability and advantage of buying lottery tickets (and insuring their participation in that program) were budgeted for a "full participation" program, the obvious wasting of human resources now theatened would be largely eliminated. To do in the future what has not been done in the past calls for no heavy commitment of the state's resources.

The relative inaction of the past—and furthermore, inaction where action has been mandated—has not been justified. The specific relief this makes necessary will be set forth after the other claims made in this case are considered.

### Other Claims

The plaintiffs' other claims all involve, with one exception, challenges to the failure of the defendants to comply with FNS regulations or instructions. Those in which relief is appropriate shall be considered first.

20. 7 U.S.C. § 2016(b) (1970) provides in relevant part:

"[T]he Secretary shall provide a reasonable opportunity for any eligible household to elect to be issued a coupon allotment having a face value which is less than the face value of the coupon allotment authorized to be issued to them under subsection (a) of this section. The charge to be paid by eligible households electing to exercise the option set forth in this subsection shall be an amount which bears the same ratio to the amount which would have been charged under subsection (b) of this section as the face value of the coupon allotment actually issued to them bears to the face value of the coupon allotment that would have been issued to them under subsection (a) of this section."

### "Variable Purchase Option"

At 7 U.S.C. § 2016(b) (1970) Congress has clearly required participating states to implement a variable purchase option plan which would allow food stamp recipients to purchase a fractional part of their monthly allotment.[20] See Food Stamp Reg. § 271.6(d)(3), 40 Fed.Reg. 1891 (1975). Pursuant to 7 C.F.R. § 271.1(s)(v) (1974) (since superseded), each state was required to implement such a plan by June 1, 1972. Not surprisingly, in light of the defendants' attitudes revealed above, no such plan was implemented in this state until July 1, 1974, more than two years after the deadline established by the federal regulations. Although at the outset of this litigation the plaintiffs challenged the defendants' failure to implement any variable purchase plan, they now contend that the plan, as implemented, does not satisfy the basic minimal requirements as established by the FNS in FNS(FS) Instruction 734–6 (1971). I agree.

Instruction 734–6(IV) & (VI) provides that, at a minimum, the variable purchase options must be listed on the ATP card itself. For persons receiving monthly cards, options allowing an election of one-quarter, one-half, three-quarters or the full monthly allotment must be listed. For those receiving cards on a semi-monthly basis, each card must list options for one-quarter or one-half of the full monthly allotment.[21] The re-

21. Under Food Stamp Reg. § 271.6(d)(4), 40 Fed.Reg. 1891–1892 (1975), the defendants must, to be in full compliance with the law, "insure that each eligible household is offered the option at the time of certification of choosing to receive coupons on a semi-monthly basis." Id. See Handbook § 2341 at 115. The advantages for participants in being allowed to elect semi-monthly benefits is the greater flexibility which it allows them. Thus, persons who receive monthly ATP's must elect at the beginning of each month whether to purchase one-quarter, one-half, three-quarters or their full monthly allotment, whereas persons receiving semi-monthly ATP's have the option twice a month of purchasing one-quarter or one-half of their monthly allotment.

cipient is to indicate his election of options by signing on the appropriate line on the card. Appended to the Instruction is a sample of the ATP card which the FNS intended the states to employ in implementing the variable purchase option program.

The defendants have admittedly adopted a program which does not satisfy the minimal requirements established in Instruction 734–6. Under their plan a food stamp recipient receives an ATP card (or two cards if he is on semi-monthly issuance) which does *not* itself list the purchase options. If he wants to purchase less than the face amount on the ATP card, he may only do so by personally turning in his card at the district welfare office, filling out a form and waiting for receipt of a new ATP card in the mail.

Quite obviously the defendants' plan places substantial burdens upon food stamp beneficiaries which are not involved in the minimal plan mandated by Instruction 734–6. In fact, those extra burdens probably render the variable purchase option unusable in the case of many individuals who are unable to make the frequently substantial journey to a district welfare office. Again, the defendants would seem to have violated not only specific regulatory instructions, but also the Congressional policy underlying the Food Stamp Act. 7 U.S.C. § 2011 (1970).

The defendants advance two justifications for their deficient program. First, they point out that the FNS itself has approved their plan. To be sure, Instruction 734–6(IV)(B)(3) provides for FNS approval of an alternative variable purchase option plan. However, that section of the Instruction states:

"The State Agency may devise its own forms and instructions, *providing the minimum requirements listed in paragraph A*, above, are met. The State Agency shall submit these forms and instructions to FNS for review and approval prior to implementation."
*Id.* (Emphasis added)

The minimum requirements of paragraph A are precisely those which the defendants' plan does not satisfy, namely, the listing of the options on the ATP card and the selection of an option by endorsement on the card itself. Clearly, the FNS, in approving the defendants' plan, violated its own Instruction 734–6. Its determination of the adequacy of the defendants' plan is therefore entitled to little or no weight.

Secondly, the defendants argue that it would be impractical to implement a plan which satisfied the minimum requirements of Instruction 734–6. Defendant Cecil McCarthy, in an affidavit submitted to this court, averred that ATP cards having multiple options are incompatible with the state's centralized computer issuing system. Use of such multiple option cards, he urged, mandates "a manual system of accounting and reporting." Affidavit of Cecil McCarthy (December 6, 1974). In addition, he states that cooperating banks "have no wish to be part of a program that offers this type of option." *Id.* He foresees a possible situation in which the state of Connecticut would be left with no banks willing to distribute food stamps to participating households.

Although there might be a factual basis for some of the defendants' concerns, this court finds it difficult to believe that the state of Connecticut lacks the administrative skill and ingenuity to

On the basis of the Interdepartment Message of June 18, 1974, from the Deputy Welfare Commissioner of Connecticut to the District Directors in which the defendants' variable purchase option plan is described, it appears that the defendants only permit semi-monthly issuance for recipients receiving ADC benefits and for the so-called "variable income" non-public assistance house-

holds. OAA–AB–AD households and "those Non PA households who receive their money once per month e. g. OASI, Pensions, Annuities, etc.," *id.*, are provided monthly issuance. However, as the plaintiffs have not challenged the defendants' compliance with Food Stamp Reg. § 271.6(d)(4), *supra*, I do not rule upon the issue.

overcome the types of problems which might result from the required implementation of a variable option purchase plan meeting the minimal requirements of Instruction 734–6. In fact, 21 states which, like Connecticut, issue ATP cards from a central computer have already implemented such a program. Such widespread and apparently successful compliance belies the gravity of the defendants' concerns.

I therefore hold that the defendants' variable option purchase plan does not satisfy the minimum requirements of federal law and they shall be ordered to implement a plan in compliance with FNS(FS) Instruction 734–6.

### *"Immediate Certification for Households with Zero Purchase Requirement"*

The plaintiffs allege that the defendants are violating both their own and federal food stamp regulations by failing to provide emergency 30-day certification for households whose applications indicate an income so low that they will likely be entitled to full certification with a zero purchase requirement. The federal regulation upon which they rely is Food Stamp Reg. § 271.4(a)(2)(iii), 40 Fed.Reg. 1890 (1975) which provides, in part, that "[c]ertification may be made for 30 days without verification of eligibility factors with respect only to households which report an income so low that they have no purchase requirement and which appear, on the basis of other information furnished, to be eligible for participation." Connecticut Welfare Reg. FS–300.2(D) essentially echoes the federal regulation.[22]

Although the plaintiffs maintain otherwise, it is quite apparent that states need not pursue this policy of emergency certification; § 271.4(a)(2)(iii) clearly uses the permissive "may" in describing the temporary certification procedure. *See* FNS(FS) Instruction 732–1(IV)(D) (1973); Handbook §§ 2313, 2332.3 at 84, 114. However, as the defendants have at least facially chosen to adopt the policy, it is necessary to consider the plaintiffs' challenges to the manner in which they are implementing it.

First, however, a fuller description of the regulatory context in which the emergency certification procedure operates is appropriate. Food Stamp Reg. § 271.4(a)(2), *supra,* establishes the steps which must be taken by the states in the certification of non-public assistance households for food stamps. Two of these steps have already been discussed, *supra:* completion of an application for participation and an interview. The third step is covered by subsection 271.4(a)(2)(iii) which basically provides that the state agency must verify the income reported in the application for participation but need only verify other eligibility factors if the application is "unclear, incomplete, or inconsistent . . . ."[23] That subsection then goes on to deal with the situation of persons who report very low income:

"In any case where a household indicates that it has income so low that there is a likelihood that a change must occur in order for the household to continue to subsist as an economic

---

22. While this case was *sub judice*, the plaintiffs brought to the court's attention the existence of what purports to be a new state food stamp manual. Because it appears that this is not legally effective, *see* Conn.Gen. Stat.Ann. § 4–168 (Supp.1974) (§ 3 of the Uniform Model State Administrative Procedure Act), no consideration has been given to it. Furthermore, a reading of the new handbook revealed that the only claim substantially effected by any change in the regulations was that involving retroactive benefits to the date of application. The problem is considered in greater detail *infra.*

23. Handbook § 2200.3 at 27 conveniently lists the nonfinancial eligibility standards:
"Nonfinancial eligibility standards apply equally to PA, SSI, and NA households and consist of:
(1) Residency in the project area;
(2) Citizenship or permanent alien status;
(3) Availability of cooking facilities;
(4) Prohibition against residency in boarding houses and institutions;
(5) Work registration."

unit, verification of factors necessary to substantiate the facts of eligibility is required unless expenditures and income are so stable as to indicate that the household could maintain this level of existence for an extended period of time. At least one collateral contact is mandatory in cases of this type. Certification may be made for 30 days without verification of eligibility factors with respect only to households which report an income so low that they have no purchase requirement and which appear, on the basis of other information furnished, to be eligible for participation."

Although this provision is somewhat ambiguous in terms of what it requires of the states in dealing with such households, its meaning has been clarified by FNS(FS) Instruction 732–1(IV)(D) (1973) and various provisions of the Handbook. From these it is clear that households reporting such low income must be subjected to even more rigorous verification than other households prior to certification. For example, Handbook § 2332.1 at 113 details the scope and depth of the interview which must be conducted with such applicants and provides that ordinarily certification in such cases should only be for one-month periods. In addition, Handbook § 2332.4 at 114 provides that such households "participating at the zero purchase level for 3 consecutive months must be made the subject of a full field investigation, including a home visit, to substantiate continuing eligibility and participation." Thus, rather than being the objects of special solicitude, the FNS seeks to treat households with zero purchase requirements as objects of suspicion.[24]

However, applicants with such low income *may* be temporarily certified pending verification for a one-month period. Handbook § 2313 at 84 establishes the procedures which must be followed for

these optional pre-verification certifications: first, the in-depth interview required under Handbook § 2332.1, *supra,* must indicate probable eligibility following verification, and secondly, the certifying officer must make at least one collateral contact to confirm information in the application. Furthermore, § 2313 only allows such emergency certification once in every six months for any one household.

As noted at the outset, the defendants have adopted a regulation dealing with "Zero Purchase Households" which provides that "preliminary certification pending verification, i. e. certification for 30 days without verification of eligibility factors,[25] may be applied to these households if it appears they will be eligible for participation." Conn. Welfare Reg. FS–300.2(D) (footnote not in original). Indeed, that policy was recently reiterated in an Interdepartment Message from the Connecticut Deputy Welfare Commissioner to the District Welfare Directors (May 3, 1974) which provided further that:

> "It is expected that the instructions contained [in the regulation] would be followed exactly and, that a household reporting an income so low or, no income at all, so that there would be no purchase requirement, would be certified for participation for a 30 day period *if all other prerequisites appear to be met."* (Emphasis in original)

Despite these statements and provisions, the plaintiffs maintain that the defendants' administration of this policy is deficient in several respects. Their first claim appears to be that all applicants who on the face of their application would be eligible for a zero purchase requirement must receive the 30-day preliminary certification. This claim is clearly negated by Handbook § 2313, *supra,* which provides that before preliminary certification at least one col-

---

24. The plaintiffs do not challenge these special provisions, nor is it clear whether the defendants have actually complied with them.

25. Of course, pursuant to Handbook § 2313, *supra,* at least one collateral contact would have to be made prior to preliminary certification.

lateral contact must be made by the certification worker and that all other eligibility requirements, such as work registration for all employable members of the household, *see* Food Stamp Reg. § 271.3(d), 40 Fed.Reg. 1889 (1975), must be apparently satisfied.

Their second complex of claims is more substantial. Basically, they maintain that despite Conn. Welfare Reg. FS–300.2(D) most applicants who would be eligible for 30-day preliminary certification are, in fact, not being considered for it. This, they maintain, is the result of the lack of a true affirmative policy by the defendants to insure that all those who are eligible are actually considered. Rather, it appears that such applications are considered and processed in the same manner as all other applications with the exception of those which the local certification officers might single out as special hardship cases. Thus, the local workers would seem to construe the permissive language in the State welfare regulation as providing them with the discretion to consider low income households for preliminary certification, but not mandating that they consider all such households to determine their eligibility.

Moreover, plaintiffs maintain that even those few who are approved for emergency certification do not receive their ATP's immediately. Forms are filled out, processed and forwarded to the central office for issuance of the ATP cards just as in the case of regular certifications. The whole process may take longer than a week, thus negating the very purpose of the preliminary certification process, to wit, the provision of immediate relief to the very poor.

The plaintiffs' claim is supported by the testimony of defendant Cecil McCarthy. In his deposition of May 30, 1974, Mr. McCarthy confirmed that delays of a week or more were normal in the issuance of ATP cards for persons with a zero purchase requirement on a 30-day preliminary certification. Furthermore, he also confirmed that there was no directive to district offices requiring them to process such applications in any way differently from regular applications. Only in the case of severe hardship, he stated, might a certification worker be inclined to push through a zero purchase certification as quickly as possible.

The record with regard to this issue is admittedly sparse. Nonetheless, on the basis of Mr. McCarthy's own testimony I conclude that the defendants are not now operating a program of preliminary 30-day certifications which insures that all households with very low incomes are given the same consideration for such emergency certification and immediate receipt of their ATP's. Having elected under Food Stamp Reg. § 271.-4(a)(2)(iii) to provide 30-day emergency certifications, the defendants are bound to operate the program in a nonarbitrary manner so as to insure equal treatment for all similarly situated low income households.

Furthermore, the decision to provide preliminary certifications carries with it an obligation to insure that eligible households encounter no delays in receiving their ATP cards. Under FNS(FS) Instruction 734–2(VI)(C) (1969) the defendants are obliged to provide ATP's immediately for newly certified households in immediate need. By definition, households with a zero purchase requirement are in that category. The same provision states that such emergency ATP cards may be issued either by the district offices or by the central office, "provided that there are no delays in allowing the household to participate." *Id.* The admitted delay of one week or more from the date of approval in the district office to the issuance of the ATP by the defendants' central office does not satisfy the strict standard of FNS(FS) Instruction 734–2 (VI)(C).

The defendants will therefore be required to implement a plan insuring that all zero purchase households will be considered equally and expeditiously for 30-day preliminary certification under the

conditions of Handbook § 2313, *supra*, and that once approved for such certification, the household will receive its ATP card as expeditiously as possible. If the immediate issuance of the ATP card cannot be guaranteed through the current system of central issuance, then the defendants will have to make provision for the issuance of the emergency ATP cards at the district office level.

*"Immediate Certification of Households on General Assistance"*

▮▮▮▮▮ The plaintiffs also challenge the failure of the defendants to provide immediate certification for applicants receiving non-federally funded welfare benefits under the general assistance program administered by the towns in Connecticut. *See* Conn.Gen.Stat.Ann. § 17–273 et seq. (Supp.1974). Their claim essentially rests upon two arguments. First, they assert that the Connecticut general assistance program satisfies the FNS criteria for determining whether general assistance recipients may have their applications for food stamps processed under the more expeditious procedure provided by Food Stamp Reg. § 271.4(a)(1), *supra*. Secondly, they argue that the more expeditious procedure mandates immediate certification upon submission by the applicant of an affidavit. For reasons that will appear, the second of these arguments will be considered first.

The food stamp regulations establish two independent procedures for the certification of food stamp applications. One such procedure, set out at Food Stamp Reg. § 271.4(a)(2), *supra*, has already been discussed above in connection with the certification of zero purchase households. That procedure is employed in the processing of the applications of households who are not receiving public assistance; currently, households receiving general assistance in this state fall

into that category. The second procedure is employed in the processing of the applications of households receiving aid under federally aided public assistance programs or general assistance programs satisfying FNS criteria. That procedure is set out at Food Stamp Reg. § 271.4(a)(1) which provides:

"The State agency shall provide for the certification of households in which all members are included in a federally aided public assistance or general assistance grant, solely on the basis of information contained in an affidavit and the assistance case file."

In addition, a further distinction is made between these two categories of applicants in terms of the income eligibility criteria which must be applied to them:

"Households in which all members are included in a federally aided public assistance or general assistance grant shall, if otherwise eligible under this subchapter, be determined to be eligible to participate in the program while receiving such grants without regard to the income and resources of the household members."

Food Stamp Reg. § 271.3(b), 40 Fed. 1888 (1975).

The plaintiffs read into the regulations a further distinction between these two categories of applicants. They argue that because a certification determination can be made solely on the basis of the applicant's affidavit and the assistance case file, that such a determination can be made quickly and in fact, *must* be made immediately upon submission of the affidavit. Their contention is, however, not supported by a fair reading of the federal regulations. The only provision in the regulations for immediate certification is Food Stamp Reg. § 271.4(a)(2)(iii), *supra*, discussed above in connection with zero purchase households.[26] Otherwise, the only refer-

---

26. Presumably the defendants could and should provide 30-day emergency certification for public assistance applicants who would be eligible for a zero purchase re-

quirement. After all, the reason for the special provision for 30-day certifications for non-public assistance households is that such certifications represent an exception in such

ence to time limitations for the processing of applications is that contained in Food Stamp Reg. § 271.4(a)(3), 40 Fed.Reg. 1890 (1975) which provides in relevant part:

"The State agency shall provide for the processing of each *affidavit* or Application for Participation and notify the applicant household of the action taken within reasonable State-established time standards, which shall not exceed 30 days after receipt of such documents." (Emphasis added)

Under Food Stamp Reg. § 270.2(a), 40 Fed.Reg. 1882 (1975), the term "affidavit" is defined as being the signed statement of application submitted by the head of a household, or his representative, all of whose members are receiving federally aided public assistance or state general assistance. Thus, FNS clearly contemplated that the states would have the same 30 days in which to process those applications as they have for non-public assistance applications.[27]

This conclusion, however, does not render it unnecessary to consider the plaintiffs' claim that general assistance households in Connecticut should be treated under the simplified procedure of Food Stamp Reg. § 271.4(a)(1). Although couched in terms of entitlement to immediate certification, their claim can be construed more liberally to be that general assistance households are entitled to treatment under § 271.-4(a)(1) because the procedure provided thereunder is less burdensome and will likely result in faster certification determinations.

In fact, there is no doubt that general assistance households would benefit greatly were their applications processed under § 271.4(a)(1) as opposed to § 271.4(a)(2). First, the defendants would not have to conduct an interview prior to certification. Handbook § 2117 at 12 provides that "[t]he interview of PA households shall be satisfied by the interview conducted in connection with their certification for public assistance."[28] Secondly, as noted above, the defendants would not have to independently verify the income figures reported in the applicant's affidavit. They could confirm such information by reference to the general assistance case file which could either be made physically available to them by the town welfare officials or information from which could be provided by telephone contact. There is little doubt that this procedure would be less burdensome to both the plaintiffs

cases to the normal requirement that income be verified before certification. In the case of public assistance applicants, there is no requirement for verification independent of the assistance case file and thus no need for a special exception. It would indeed be anomalous if the simplified procedure provided for public assistance applicants were read to exclude them from consideration for 30-day emergency certification pending final verification.

27. The Department of Agriculture which participated in this case as amicus curiae agrees with this conclusion. At page 6 of its brief it states:

"In any event, public assistance households are not provided immediate certification under 7 CFR 271.4(a)(1). Such households are considered to be automatically eligible for the program only as to the factors of income and resources. With respect to other eligibility factors, and to numerous other program determinations (for example, the level of income

for determination of purchase requirements) such households must be certified in the same manner as non-public assistance households. Likewise, affidavits must be provided and any inconsistent items verified. Thus, in terms of immediacy of certification, public assistance households are treated the same as non-assistance households, and in neither case is immediate certification provided."

28. In fact, as set out in Handbook § 2115 at 11, there is really no need for the public assistance applicant to visit the food stamp certifying office:

"PA households who apply for food stamp benefits are certified on the basis of an affidavit and information contained in the PA case file. Households which are currently recipients of public assistance may mail in the affidavit. There should be no need for the PA recipient to make a special visit to the office to execute the affidavit. A new affidavit will be executed at each subsequent certification."

and the defendants and would likely result in the plaintiffs receiving food stamp benefits more quickly than under current procedures.

The plaintiffs claim that Connecticut's general assistance program satisfies the criteria of Food Stamp Reg. § 270.2(ee), 40 Fed.Reg. 1883 (1975) and FNS(FS) Instruction 732–5, and thus applicant households, all of whose members are receiving general assistance, should be certified pursuant to the provisions of § 271.4(a)(1). Food Stamp Reg. § 270.-2(ee) essentially provides that the FNS shall determine which general assistance programs may be equated with federally aided public assistance programs for the purposes of § 271.4(a)(1). Generally, the standard to be applied is whether the general assistance program applies the same or similar "criteria of need" as that applied under any of the federally aided assistance programs.

FNS(FS) Instruction 732–5 refines the standard of § 270.2(ee) by establishing specific criteria which must be satisfied by the general assistance program. There are seven criteria of which the program must satisfy one of the first four and all of the final three. The plaintiffs concede that Connecticut's general assistance program does not satisfy any of the first three standards; it

is their contention that the program does meet the fourth and the final three, all of which are set out in the margin.[29]

There is really no dispute among the parties that the fourth criteria has been satisfied. Under controlling Connecticut law, see Conn.Gen.Stat.Ann. § 17–273 (Supp.1974), the local towns must administer a general assistance program, subject to 90% reimbursement from the state. Conn.Gen.Stat.Ann. § 17–292 (Supp.1974). It is also clear that food stamp certification responsibility is retained by the State Agency and that a written agreement has been executed between the defendants and each of the towns in this state.

There also can be little doubt that the state's general assistance program satisfies FNS(FS) Instruction 732–5(III)(A)(5) & (6). Under Conn.Gen. Stat.Ann. § 17–3a (Supp.1974), the defendant Commissioner of Welfare has the responsibility of "establishing mandatory standards concerning the granting of general assistance by towns, including standards for . . . eligibility and extent of need . . . , all with the intent of aiding the towns . . . in the efficient administration of the laws relating to the granting of general assistance."[30] There is no dis-

**29.** "4. Upon request of the State Agency, programs administered by a local governmental agency, other than the agency administering the federally aided public assistance programs, providing that responsibility for food stamp certification is retained by the State Agency and a written agreement is executed outlining responsibilities of each agency; and

"5. Standards of assistance are the same as or similar to those in a federally aided public assistance program. Such standards may be at a lower level or less comprehensive than public assistance standards; and

"6. Other criteria of need, such as resource limitations, do not exceed those used in the federally aided public assistance programs; and

"7. The personnel responsible for certification of general assistance households shall meet the personnel standards specified in Section 271.1(g) of the revised

Food Stamp Program Regulations issued July 29, 1971." FNS(FS) Instruction 732–5(III)(A) (1971) (emphasis in original).

**30.** Conn.Gen.Stat.Ann. § 17–3a (Supp.1974) provides in full:

"The welfare commissioner shall establish mandatory standards concerning the granting of general assistance by towns, including standards for investigation and eligibility and extent of need and procedures for record-keeping and other office practices, all with the intent of aiding the towns and any districts established under section 17–273a in the efficient administration of the laws relating to granting of general assistance. The commissioner shall inform the towns and such districts of the standards so established and shall advise and assist them in their application thereof. The commissioner may recommend regional areas within which he con-

pute that the Commissioner has, in fact, established standards of eligibility for general assistance which are precisely those employed by the state in its administration of the federally-aided AFDC program.[31]

The only real dispute between the parties is with regard to the interpretation of Instruction 732–5(III)(A)(7) which provides:

> "The personnel responsible for certification of general assistance households shall meet the personnel standards specified in Section 271.1(g) of the revised Food Stamp Program Regulations issued July 29, 1971."

The plaintiffs contend that this means that the personnel who certify general assistance households for *food stamps* must satisfy the standards of Food Stamp Reg. § 271.1(g), 40 Fed.Reg. 1885 (1975).[32] In support of this interpretation they argue that the word "certification" is a term of art within the context of food stamp regulations and instructions, *see* Food Stamp Reg. § 270.2(1), 40 Fed.Reg. 1882 (1975), meaning approval of an application for food stamps. The defendants, on the other hand, argue that the disputed provision means

that the personnel who initially certify households for *general assistance benefits* must meet the standards of Food Stamp Reg. § 271.1(g). Their position is strongly supported by the requirement in Instruction 732–5(III)(A)(4) that responsibility for food stamp certification of general assistance households be retained by the state agency. Thus, the plaintiffs' interpretation would render Instruction 732–5(III)(A)(7) redundant of the requirement in (III)(A)(4).

Although inclined toward the defendants' interpretation of Instruction 732–5(III)(A)(7), this court finds it preferable to allow the FNS to pass upon the issue of whether the state's general assistance program satisfies that criterion. The language of the instruction is inherently ambiguous and thus it is appropriate here to allow the administrative agency responsible for its drafting to pass upon its meaning. Furthermore, even assuming the correctness of the defendants' interpretation, this court has before it no evidence with regard to whether "the personnel responsible for certification of general assistance households" in the towns of this state satisfy the standard of Food Stamp Reg. § 271.-1(g).[33]

---

siders it reasonable for towns to join in the establishment of such districts, and may advise the towns therein of such recommendations and his reasons therefor. The commissioner may withhold reimbursement, as provided in section 17–292, from any town or district which does not conform to such standards within the period of grace to be established by the commissioner."

31. This is clear from the admission of Deputy Welfare Commissioner Henry Boyle in a deposition conducted in the course of another law suit in which the Commissioner of Welfare is also a defendant. Moore v. Dunn, No. N74–146. Relevant excerpts from the deposition transcript were made a part of the record in this case without objection by the defendants.

32. "Each State agency shall undertake the certification of applicant households in accordance with the personnel standards used by it in the certification of applicants for benefits under its federally aided public assistance programs."

Under 45 C.F.R. § 70.1 et seq. (1974) a merit system is mandated for personnel working in federally aided public assistance programs.

33. A strict reading of that regulation would seem to mandate that the general assistance program in each town operate under a merit system which satisfies the standards of 45 C.F.R. § 70.1 et seq. (1974). *See* note 32, *supra.* However, the FNS may not interpret FNS(FS) Instruction 732–5(III)(A) (7) to require complete parity between the local and state personnel standards. Furthermore, it is possible that many, although not all, towns in Connecticut have merit systems which satisfy the standards of 45 C.F.R. § 70.1 et seq. (1974). It is not clear whether general assistance programs may be approved for processing under Food Stamp Reg. § 271.4(a)(1) for some communities in the state, but not all. Because there are ambiguities with regard to all these issues, the determination is best left to the FNS.

In late 1971 the FNS questioned the decision of the defendants to treat households receiving general assistance as non-public assistance households. In fact, in a letter from the Northeast Regional Administrator of the FNS to the Commissioner of Welfare (December 20, 1971), the State Food Stamp Plan of Operation was approved

"contingent upon further review of the State general assistance programs. Therefore, we request that you submit to us by December 31, 1971 the information required [by] FNS (FS) Instruction 732–5, Section 4 [*sic*] for each political sub division in the State. ·Cities and towns hav[ing] comparable programs may be grouped for reporting purposes."

This information was apparently never provided to the FNS. It must be now.

This court thus determines that the requirements of Instruction 732–5(III)(A)(4), (5) & (6) are satisfied by the state's general assistance program. The defendants will be required to submit to the FNS a *detailed, objective* report containing all of the information requested in the letter quoted above pertaining to the requirement of Instruction 732–5(III)(A)(7). Should the FNS determine that the general assistance program, as operated in either all or parts of the state, satisfies that criterion, this court will then issue an order requiring the defendants to begin processing general assistance household applications pursuant to Food Stamp Reg. § 271.4(a)(1) in the entire state or the appropriate political subdivisions thereof.

*"Failure to Process Applications Within 30 Days of Date of Application"*

The plaintiffs maintain that the defendants have been violating Food Stamp Reg. § 271.4(a)(3), *supra*, by failing to process all applications within 30 days of their receipt and to notify applicant households as to whether they have been certified for food stamp benefits within the same period of time. There has never been any dispute between the parties as to the existence of this obligation.[34] Rather, the dispute has centered upon the factual issue of whether or not the defendants were actually complying with the acknowledged regulatory mandate.

That dispute, however, has now been resolved by virtue of a stipulation submitted by the parties while this case was *sub judice*. In that stipulation, the defendants admit that "[t]here are applications for food stamps which do not get processed within 30 days." Stipulation of February 18, 1975, ¶ 2. The extent of such noncompliance with § 271.-4(a)(3) is not specified, nor is it particularly relevant. The regulation requires that *each* application shall be processed within 30 days and to the extent that there are cases in which this is not being done, the defendants are acting in derogation of the regulatory mandate.

The question of what relief should be afforded is slightly more troublesome. The plaintiffs have proposed two independent remedial means of dealing with cases in which the defendants fail to process applications within 30 days: presumptive eligibility and automatic forward adjustment. Under the former proposed remedy, all households

---

34. The regulation requires that the state both "provide for the processing" of applications *and* "notify" applicants of action taken within 30 days. The crucial date, of course, is the date of certification, because it is from that date that benefits will run. However, the regulation also requires that applicants be notified of action taken within 30 days. In this state, certified applicants are notified by the mailing of their ATP cards.

While there has been some dispute between the parties as to how the notification requirement may be satisfied, there can be no doubt that the beneficial effects which flow . from the notice requirement could not be more effectively implemented than by using the ATP card as the notice; and, if it is placed in the mail by the end of 30 days, that is sufficient.

whose applications are not acted upon within the 30 days would be presumed eligible at the end of that period and would be mailed an ATP card. The presumption would continue until a contrary determination were actually made. While probably effective, this remedy would undermine the requirement of 7 U.S.C. § 2014 (1970) that only those households which satisfy the uniform national standards of eligibility be certified for participation in the program. The certification of households whose applications have not been reviewed does not guarantee that result.

The plaintiffs' other proposed remedy, *automatic* forward adjustment, is more appropriate. Forward adjustment is a process designed by the courts, *see* Bermudez v. United States Dep't of Agriculture, 160 U.S.App.D.C. 150, 490 F.2d 718 (1973); Carter v. Butz, 479 F.2d 1084 (3d Cir.), cert. denied, 414 U.S. 1094, 94 S.Ct. 727, 38 L.Ed.2d 552 (1973); Stewart v. Butz, 356 F.Supp. 1345 (W.D. Ky.1973), aff'd, 491 F.2d 165 (6th Cir. 1974), and accepted by the FNS, *see* 39 Fed.Reg. 13013 (1974), for the provision of retroactive benefits to participating households who have had their food stamps wrongfully denied, delayed or terminated by reason of administrative error. Any "bonus" lost as a result of such error is provided retroactively, not by means of a cash payment, but rather through the reduction of the household's "purchase requirement." Thus, for example, a household, which has lost $60 of "bonus" as a result of a delay in certification and which was certified to purchase $150 worth of food stamps for $90, would only have to pay $30 for its stamps during the first month.

Normally, entitlement to a forward adjustment is determined through the process of a fair hearing. However, as the plaintiffs maintain, there is no need for requiring such a formal adjudication where the facts are clear and indisputable. That is the situation here. *See* Proposed Food Stamp Reg. § 271.-1(q)(1)(i)–(iv), 39 Fed.Reg. 35179 (1974). Where certification is granted after the 30-day period there should be no issue as to the household's entitlement to a forward adjustment that will include benefits from the 30th day following the date of application.[35] The regulatory mandate is clear, there can be no circumstances justifying the delay,[36] and the facts necessary for the determination are easily available to the defendants. In such situations there is no reason why an aggrieved household should be required to initiate action by requesting a fair hearing, for since certification has been made, there would be no issue in dispute. Rather, the defendants will be required to carefully monitor the processing of both public assistance and nonpublic assistance applications (or affidavits) and in those cases where certification is granted beyond 30 days to provide an *automatic* forward adjustment for benefits lost as a result of the delay, beginning with the first month's allotment of food stamps.

*"Failure to Provide Emergency ATP Issuance Where Card is Lost, Stolen or Otherwise Rendered Unusuable"*

The plaintiffs contend that the defendants have failed to implement FNS(FS) Instruction 734–2(VI)(C) (1969) which provides in relevant part:

*"Emergency ATP Cards—*In emergency cases (newly certified households in immediate need, loss or theft of ATP's, etc.) immediately prepare those ATP's which the household will

---

**35.** Note that this issue is independent of the plaintiffs' claim that benefits must be provided retroactively from the date of application, rather than from the date of certification. *See infra.* However, were the plaintiffs ultimately to prevail on that claim, that might require some revision of the relief provided under this claim.

**36.** Of course, if the household fails to cooperate with the defendants by, for example, not providing necessary documents, then the application should be denied at the end of 30 days.

need in order to participate before the next regular preparation of ATP's."[37]

The application of this provision to the situation of zero purchase households has already been considered, *supra.* The instant claim is specifically addressed to the defendants' alleged failure to formally implement an emergency program to cover situations wherein an ATP card is lost, stolen, not mailed through administrative error, or otherwise, in the plaintiffs' words, "rendered unusable." By the phrase "rendered unusable," the plaintiffs seem to have in mind a situation in which a household upon receipt of its ATP card does not have the money to purchase food stamps and is thus unable to use the ATP card.

The defendants admit that no formal instructions have been issued to food stamp personnel to implement the requirements of Instruction 734–2(VI) (C). However, they have presented evidence that emergency ATP cards are being issued where cards are lost, stolen or mutilated for households who come into a district office and fill out an affidavit. The central office is immediately told by the district office to cancel the original ATP and apparently a new card is placed in the mail that same day.[38] The defendants admit that it is not official policy to require certification workers to inform participants of this procedure and apparently no provision is made for hardship cases where the participant is unable to travel to the district office to sign the affidavit.

Although the defendants are currently operating an emergency issuance procedure which substantially complies with Instruction 734–2(VI)(C), the failure to issue written instructions to program personnel violates Food Stamp Reg. § 271.4(a)(8), 40 Fed.Reg. 1891 (1975) which provides, in part, that "[t]he State agency shall issue written program instructions to personnel responsible for the certification of applicant households." The defendants shall therefore be required to draft such instructions which shall direct certification workers to inform participating households of the emergency procedures.

In addition, the failure to make provision for hardship cases violates the overall purpose of the Food Stamp Act, to wit, "to safeguard the health and well-being of the Nation's population and raise levels of nutrition among low-income households." 7 U.S.C. § 2011 (1970). The defendants shall therefore include in their written instructions a provision permitting telephone applications for replacement emergency ATP cards under the same set of circumstances to be provided for in their revised "full participation" program. *See supra.*

However, the defendants may restrict the emergency issuance plan to cover those situations involving lost, stolen, mutilated or unmailed ATP cards. There is no basis for expanding the coverage of Instruction 734–2(VI)(C) to include situations wherein the ATP card is "rendered unusable" because the household does not have the money to purchase food stamps at the time it receives its ATP card. To a considerable extent, this is the kind of situation

---

37. In full, that section provides :
"*Emergency ATP Cards*—In emergency cases (newly certified households in immediate need, loss or theft of ATP's, etc.) immediately prepare those ATP's which the household will need in order to participate before the next regular preparation of ATP's. Either the CU [certifying unit] or the MDPU [machine data processing unit] may prepare emergency ATP's provided that there are no delays in allowing the household to participate.

When the monthly processing of executed ATP cards (paragraph D below) reveals that a household has used both regular and replacement ATP's to acquire more bonus coupons than they are certified to receive, the MDPU shall immediately notify the CU to determine if a claim against the household is warranted."

38. In January 1974, 238 such emergency cards were issued; 18 in February 1974; 234 in March; and 111 in the first half of April.

which the variable purchase plan was designed to ameliorate.[39]

## "Failure to Provide Benefits Retroactive to the Date of Application"

The plaintiffs challenge the unequal treatment which results from the application of Conn.Welfare Reg. FS–520.-31–520.32. FS–520.31 provides that those persons on a monthly basis of coupon issuance whose applications for food stamps are approved before the 11th of the month will receive a monthly allotment to be used within that month and, of course, another allotment at the beginning of the following month. Persons whose applications are approved on the 12th of the month or later receive a one-month allotment which must cover through the end of the next month. Thus, persons who apply for benefits on the same day may be very differently treated, depending solely upon the date of approval of their applications. FS–520.31 provides a similar scheduling for those on a semi-monthly basis of coupon issuance.

The plaintiffs do not argue that these state regulations conflict with any federal statute or regulation and thus no Supremacy Clause issue is presented. Rather they contend that the regulations violate the equal protection clause of the fourteenth amendment and are thus unconstitutional. This court lacks the jurisdiction to consider their claim. As the plaintiffs seek a permanent injunction restraining the operation of state regulations of statewide application upon the grounds of their unconstitutionality, a three-judge panel of the district court would have to be convened to consider their claim. 28 U.S.C. § 2281 (1970);[40] see Oklahoma Gas Co. v. Russell, 261 U.S. 290, 43 S.Ct. 353, 67 L.Ed. 659 (1923).

However, the court has been informed that a new handbook of state regulations relating to the food stamp program is in the process of being put into effect, see note 22, supra. Since the proposed new handbook contains no regulation tracking FS–520.31–520.32, the target of the

---

39. In some circumstances, including that of plaintiff Ethel Williams, the inability to purchase food stamps is the direct result of the Welfare Department's failure to send participants their assistance checks on schedule. In such cases, the hardship can be, and apparently is being, remedied by provision for obtaining quick replacement of the missing assistance check.

40. 28 U.S.C. § 2281 (1970) provides:
    "An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."
    The plaintiffs claim that there is no need for convening a three-judge panel in the instant case because any defense to their claim has been rendered insubstantial by virtue of this court's opinion in Class v. White, No. 14,764 (D.Conn. June 16, 1972). In that case it was held that a similar regula-

tion dealing with welfare benefits was in conflict with a federal regulation requiring the provision of assistance on an objective and equitable basis. In addition, and without a full discussion of the issue, it was held that the regulation also violated the equal protection clause of the fourteenth amendment.

Under Bailey v. Patterson, 369 U.S. 31, 33, 82 S.Ct. 549, 551, 7 L.Ed.2d 512 (1962), "three judges are . . . not required when . . . prior decisions make frivolous any claim that a state statute on its face is not unconstitutional." Prior decisions of the Supreme Court can render a defense insubstantial as probably can decisions of the Second Circuit. Cf. Nieves v. Oswald, 477 F.2d 1109, 1112 (2d Cir. 1973). However, an opinion of a district court, although of perhaps persuasive precedential value, is not binding upon this court and thus cannot have the same effect. This is particularly true where, as here, the prior opinion upon which the plaintiffs rely involved a different, albeit analogous, regulation and did not fully discuss the constitutional issue.

The decision in Class v. White, supra, however, does highlight the substantiality of the plaintiffs' claim for the purposes of three-judge jurisdiction. Goosby v. Osser, 409 U. S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973).

constitutional attack, the issue may no longer require a court of three judges. Convocation of a three-judge panel shall therefore be held in abeyance pending further clarification.

### "60-Day Continuing Certification Following Intrastate Move of Recipient Households"

██ ██ The plaintiffs challenge the alleged failure of the defendants to implement the requirement of Food Stamp Reg. § 271.4(a)(6), 40 Fed.Reg. 1891 (1975) which provides in relevant part:

> "*Certification continuation.* The State agency shall provide for continuing the certification for 60 days after the date of its move of any household which moves from one project area to another."

See 7 U.S.C. § 2019(c) (1970); FNS(FS) Instruction 732–1(VIII)(A); Handbook §§ 2420–2427 at 127–135.

Neither of the named plaintiffs who raise this claim falls within the protection of this provision. Plaintiff Robin Jackson alleges that she and her family moved within the town of South Norwalk and failed to receive 60-day certification. Quite clearly her move was not from one project area to another.

Similarly, but less obviously, the same is true of plaintiff Fern Carver. She complained that although she had notified the Manchester subdistrict office of the State Welfare Department of her move from the town of Vernon to the adjoining town of Tolland, the defendants continued to mail her ATP cards to her former address. Both Vernon and Tolland are within the same food stamp certification administrative district. It would thus appear that her move was not from one project area to another.

This is so despite the definition of "project area" at Food Stamp Reg. § 270.2(pp), 40 Fed.Reg. 1883 (1975) as being "the political subdivision within a State which has been approved for participation in the program by the Department." Although it is not clear what a political subdivision is for the purposes of the food stamp program, it would most comport with the purpose of 7 U.S.C. § 2019(c) and Food Stamp Reg. § 271.4(a)(6) to interpret it here as including all towns within the same certification district. That statutory purpose is to insure that those participating households who move from one project area to another not lose their food stamp benefits following their move because of the delay involved in reapplying for benefits at their new location. Where the household moves *within* a project area there would be no danger of such loss, because the certifying office of that project area could just note a change of address on the household's file and continue sending ATP cards to the new address. There would be no need to reapply for benefits following such a move.

That is the precise situation here. A certification worker in this state, upon receiving a telephone call from a recipient household, fills out a form and notes the change in the case file. If anything, plaintiff Carver was the victim of an administrative error.

The defendants have no obligation to implement the policy of § 271.4(a)(6) to cover moves from one location to another *within* a food stamp certification administrative district. Although they may have such an obligation to implement such a program to cover moves *between* districts, these plaintiffs do not have the standing to raise that claim.[41]

---

41. It is difficult to understand why the plaintiffs have so vigorously advanced this claim even with regard to interdistrict moves. The defendants have adopted a written policy, Conn.Welfare Reg. FS–650 (1973), which provides for interdistrict continuing certification. As in the case of intradistrict moves, the household need only inform the district office by telephone that it is moving and the case file is then forwarded to the district office in the area to which the household is moving. This is a simplified procedure which does not require the participant to travel to the district office, a burden which the plaintiffs have sought to have lifted in a number of their other claims. The 60-day continuing certification plan, as outlined in Handbook §§ 2420–2427 at 127–135, on the other hand, would provide minimal additional benefits to very few house-

*Relief*

As the state food stamp program, as operated by the defendants, has been found not in compliance with the Food Stamp Act and the regulations and instructions promulgated thereunder in the respects discussed above, an order is necessary to secure future compliance. Accordingly, it is ordered that:

I. Within 30 days of this order the defendants shall submit to this court for approval a "full participation" plan including elements addressed to both the "informational" and "insurance" requirements of 7 U.S.C. § 2019(e)(5) (1970).

(a) The informational or "outreach" part of the plan must include, *at a minimum,* concrete programs and proposals for:

(1) intensifying efforts to secure immediately the cooperation of other federally-funded agencies and organizations, as well as community and private groups;

(2) the employment of a *full time* "outreach" director and the assignment of district employees as local "outreach" coordinators; and

(3) a full scale and continuing media campaign to inform low income households of the availability of food stamps, changes in the program, procedures for applying and certification office locations.

In addition, the defendants are to consider the possible use of a toll-free number which low income households could call to secure information about the program, and door-to-door canvassing in high-density, low-income neighborhoods. In preparing this plan, the defendants should be receptive to suggestions offered by the plaintiffs and should consult other states with successfully operating "outreach" programs.

(b) The "insurance" part of the plan must provide for the simplification and

expedition of certification procedures. The defendants are to review their current procedures to determine in what way they can be improved in the interest of insuring full participation. *At a minimum,* however, the plan must provide for:

(1) a written directive to and in-service training for local certification staff to insure that persons making initial inquiries about food stamps are informed of their right to apply for benefits *immediately* either in person or through the mail and are *encouraged* to do so; and

(2) the conducting of telephone and home interviews under a wider range of circumstances than currently allowed, including situations in which no household representative is able to visit the district office or circuit-riding location because of sickness, injury, lack of transportation or the presence of pre-school or other persons in the home requiring care.

In addition, the defendants must consider soliciting the cooperation of federally-funded agencies and organizations and private and community groups in providing transportation services for applicants and assisting them in completing application forms. The current circuit-riding program should be continued and consideration should be given to its expansion.

II. Within 60 days of this order, the defendants shall fully implement a variable purchase option plan which satisfies the minimal requirements of FNS(FS) Instruction 734–6(IV).

III. Within 30 days of this order, the defendants shall issue a written directive to local certification workers requiring them to consider the eligibility for 30-day preliminary certification of *all* households reporting an income so low

holds and would require the participant to fill out a form in the district office and sub-

mit a copy of it to the district office in the area to which he is moving.

as to make them eligible for a zero purchase requirement. In addition, they shall take steps to insure that within 30 days all households approved for such preliminary certification will receive their ATP cards as expeditiously as possible, but, in any event, more rapidly than the one-week period now normally required for processing. The defendants shall submit to this court and to the plaintiffs a monthly report indicating the number of such 30-day certifications approved during the previous month and the average period of time required for *receipt* of such ATP cards by certified households.

IV. Within 30 days of this order, the defendants shall prepare a detailed and objective report of the personnel standards for employees certifying households for general assistance benefits in each political subdivision of this state. Said report shall be submitted to this court and to the plaintiffs and an opportunity shall be provided for comments and changes suggested by the plaintiffs. The report shall then be submitted to the FNS for *its* determination as to whether the general assistance program within all or parts of the state satisfies the requirement of FNS(FS) Instruction 732–5(III)(A)(7). The defendants shall report the decision of the FNS to this court for its possible further action.

V. (a) The defendants shall take immediate action to insure that the applications of all public assistance and nonpublic assistance households are processed within 30 days and that such households are notified of the action taken within the same period of time. The 30-day period shall commence with the receipt at the district office of a signed application or affidavit and the notification requirement shall be satis-

fied by the mailing of an ATP card or notice of denial within the 30-day period.

(b) In those cases in which certification occurs after the 30-day period, the defendants shall provide an *automatic* forward adjustment for lost benefits, beginning with the food stamp allotment for the first month. The defendants shall inform affected households that such remedial action has been taken. Within 30 days of this order, the defendants shall submit for court approval a regulation setting forth procedures for the implementation of this section of the order.

Nothing in this order shall prevent a household from obtaining a fair hearing should it disagree for some reason with the defendants' determination with regard to entitlement to or the amount of a forward adjustment.

(c) The defendants shall include a notice with the next ATP card mailed to all participating households, informing them of their right to apply for a forward adjustment for any benefits which they may have lost as a result of a delay in the initial provision of food stamps to them. The defendants shall endeavor to settle such claims informally and expeditiously, but where this is not possible, the claimants shall be afforded a fair hearing.[42]

(d) The defendants shall file monthly reports, with copies to counsel for the plaintiffs, detailing the processing of both public assistance and non-public assistance applications. Each report shall specify the number of applications held pending from the previous reporting period, the disposition of all applications during the reporting period, indicating how many were approved, denied or held pending, and a breakdown of the cases

42. The thrust of this provision of the order is to make the *automatic* award of forward adjustments prospective only. In view of the increased burden already being imposed upon certification personnel, it does not appear appropriate to require them to make an exhaustive review of all prior case files to discover possible past delayed certifications.

pending in excess of 30 days in 5-day increments. In addition, the defendants shall report the number of cases in which automatic forward adjustments were provided. With the first such report, the defendants shall submit a detailed description of the method used for obtaining the statistics contained therein. Any subsequent modification of that method shall be reported.

VI. Within 30 days of this order, the defendants shall promulgate a regulation providing for emergency and immediate replacement of ATP cards that are lost, stolen, mutilated or not mailed through administrative error. Said regulation shall provide for informing participating households of this service and for permitting application under the same hardship circumstances detailed above with regard to the "full participation" program.

VII. Within 45 days of this order, the defendants shall conduct in-service workshops for all district directors and local certification workers to explain the changes ordered herein and insure their full implementation.

VIII. At 60-day intervals the defendants shall file written reports which detail as of each reporting period (1) what action has been taken to comply with the several elements of this order, and (2) with regard to continuing programs, what further actions are scheduled.

Convocation of a three-judge panel of the district court to consider the plaintiffs' challenge to Conn. Welfare Reg. FS–520.31–520.32 will be held in abeyance, pending further clarification of whether there is a regulation to be challenged, with leave to move for the convocation of a three-judge court thereafter.

The prayer for attorneys' fees is denied, but costs are awarded to plaintiffs. In all other remaining respects the plaintiffs' prayer for relief is denied. It is

So ordered.