**Henry CHARETTE, Jr., by his mother and next friend Florence Charette, et al., Plaintiffs,**

v.

**Bob BERGLAND, Secretary of Agriculture, et al., Defendants.**

**Civ. A. No. 76–0145.**

United States District Court, D. Rhode Island.

Sept. 13, 1978.

John M. Roney, Providence, R. I., Lorelei Borland, Ronald Pollack, Roger Schwartz, of Food Research and Action Center, Inc., New York City, for plaintiffs.

Paul F. Murray, U. S. Atty., Providence, R. I., Elisa B. Vela, Civil Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

## OPINION AND ORDER

PETTINE, Chief Judge.

This action is brought on behalf of a certified nationwide class of needy children who are eligible for free or reduced-price breakfasts under the federal School Breakfast Program, National School Lunch Act & Child Nutrition Act, 42 U.S.C. §§ 1751 *et seq.*, but who do not receive breakfast due, allegedly, to the failure by defendant officials of the United States Department of Agriculture ("USDA") to promulgate and enforce regulations, 7 C.F.R. § 220 *et seq.*, that properly implement statutory mandates, 42 U.S.C. §§ 1759a(e)(1), 1773(g). The case is presently before the Court on cross motions for summary judgment.

The School Breakfast Program ("SBP") is one of a number of federal initiatives designed to promote the nutritional health of American children from the beginning of life in the mother's womb through the high school years. Federal efforts concentrated initially on funding free noontime meals in local school districts that chose to participate. As the evidence of a substantial link between a nutritional meal and better school participation mounted, Congress in 1966 extended funding on a pilot basis for a morning meal. The program was initially established and has continued to operate on a voluntary basis; a local school district authority that elects to participate in the program applies on behalf of some or all the schools in the district to the state educational agency. 7 C.F.R. § 220.7(a). When funds were limited, first priority in selection of participating schools and disbursement of funds by a state educational agency was "to those schools drawing attendance from areas in which poor economic conditions exist and to those schools to which a substantial proportion of the chil-

dren enrolled must travel long distances". 42 U.S.C. § 1773(c). While the program expanded in succeeding years to fund "all schools which make application for assistance and agree to carry out a nonprofit breakfast program", § 1773(a), Congress' central concern remained to reach schools in poor areas with the highest concentration of needy children. For example, under the present statute, a state plan, which the USDA must approve before a state is entitled to federal funding, is required to detail the state's use of funds "to the maximum extent practicable to reach needy children". § 1759a(e)(1)(C). Again consistent with the focus on needy children, Congress has attempted to correct the economic disadvantages of schools in low-income areas and provide added incentive by offering higher reimbursement rates for breakfasts, § 1773(b)(2), and food service equipment assistance, § 1774, to schools "in severe need".

Dissatisfied with the expansion rate of the breakfast program compared with the number of children receiving lunch, but even more convinced of the multiple benefits of a nutritionally sound morning meal, Congress in 1975 made the SBP a permanent program. Congress reaffirmed its commitment to expansion of the program, particularly in needy schools stating:

> As a national nutrition and health policy, it is the purpose and intent of the Congress that the school breakfast program be made available in all schools where it is needed to provide adequate nutrition for children in attendance. 42 U.S.C. § 1773(g).

The Secretary of Agriculture, in cooperation with the state educational agencies, was directed to "carry out a program of information in furtherance of this policy", and "to report to the committees of jurisdiction in the Congress his plans and those of the cooperating state agencies to bring about the needed expansion in the school breakfast program". *Id.*

### I.

█ The first issue before the Court is whether Congress intended by the 1975 amendment to do more than recommit federal funds and agency efforts to actively encourage expansion in needy schools but, rather, to require establishment of the SBP in all needy schools. This conversion from a voluntary to a mandatory program was accomplished, plaintiffs argue, by the language "be made available in all schools where it is needed". With this interpretation, the Court cannot agree.

Not the least of the many factors that argue against plaintiffs' interpretation is the language Congress actually chose. Denominating the breakfast program expansion a matter of "policy" rather than a federal requirement is consistent with the voluntary tone of "be made available". More importantly, it is consistent with the voluntary language in § 1773(a), which was not repealed and which provides for the breakfast program "in all schools which make application for assistance and agree to carry out a nonprofit breakfast program".

At best, the 1975 language is ambiguous, as plaintiffs urge, and requires recourse to the legislative history and purpose to determine congressional intent. But even plaintiffs' strongest evidence, statements unequivocally supporting mandatory implementation by congressional sponsors and members of the various committees that considered the amendments,[1] indicate that a least some key congressmen were aware of the significant transition from voluntary to mandatory yet eschewed the obvious vocabulary that would better articulate that transition.

---

1. *E. g.,* 121 Cong. Rec. S12341 (daily ed. July 10, 1975) (remarks of Sen. Humphrey); 121 Cong. Rec. S12365 (daily ed. July 10, 1975) (remarks of Sen. Philip Hart); 121 Cong. Rec. S12365–6 (daily ed. July 10, 1975) (remarks of Sen. Kennedy); 121 Cong. Rec. 12372 (daily ed. July 10, 1975) (remarks of Sen. Clark); 121 Cong. Rec. 12047–48 (1975) (remarks of Rep. Chisholm); 121 Cong. Rec. 12046 (1975) (remarks of Rep. Zeferetti); 121 Cong. Rec. 12036 (1975) (remarks of Rep. Miller); 121 Cong. Rec. 12384 (1975) (remarks of Rep. Meed); 121 Cong. Rec. 12045 (1975) (remarks of Rep. Hawkins).

These statements by partisan congressmen read into the record without debate stand alone in support of plaintiffs' interpretation. No mention of mandatory implementation is made in discussion of § 1773(g) in any of the committee or conference reports which better reflect the considered consensus of congressional opinion than the statements of individual legislators on the floor of the House and Senate. *See Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1970) (committee reports more reliable indicator of congressional intent than floor colloquy). The silence is indeed telling, since mandatory implementation would work a dramatic alteration in the whole concept of the federal feeding programs and significantly involve the federal government in an area of local school administration; these changes are at least noteworthy. Not only are the reports silent, but the House report expressly states that "[p]articipation at the local level is voluntary", S. Rep. No. 94–259, 94th Cong., 1st Sess., at 9, (1975), and that the purpose of § 1773(g) is to "*encourage* an expansion of the program", H. Rep. No. 94–68, 94th Cong., 1st Sess., at 2, (1975), U.S. Code Cong. & Admin. News. 1975, pp. 993, 1001 (emphasis added). The Senate Select Committee on Nutrition and Human Needs, whose extensive hearings produced the Senate version of the bill that was ultimately enacted without substantial change, attributed the slow growth rate of the breakfast program mainly to lack of information and described § 1773(g) as "an attempt to reach [the schools] and bring them into participation". Working Paper, 94th Cong., 1st Sess. (1975) at 205. The Reports' unanimous silence on mandatory implementation reflects the total absence of discussion of, or testimony concerning, that change in hearings before the House Subcommittee on Elementary, Secondary and Vocational Education of the Committee on Education and Labor, which reported out the bill. Hearing on H. 3736, 94th Cong., 1st Sess. (1975). In contrast to the affirmations of mandatory implementation cited by plaintiffs, several legislators who spoke on the floor in favor of breakfast program expansion also significantly failed to mention the mandatory aspect. *E. g.,* 121 Cong. Rec. 12048 (remarks of Rep. Ottinger); 121 Cong. Rec. 12383 (letter of Rep. Krueger); 121 Cong. Rec. 22189 (remarks of Sen. Allen) ("This program must be made available to all schools desiring to participate.").

Amendments presently under consideration, unlike 1975, have evoked dissension over mandatory implementation. The Senate Committee deleted a mandatory provision because "the decision to conduct a breakfast program should be made by local authorities who are familiar with community needs". S. Rep. No. 95–884, 95th Cong., 2d Sess., at 23 (1978). The House version that retains the Secretary of Agriculture's proposal for mandatory implementation in schools serving a percentage of free or reduced-price lunches, drew a sharply worded minority report. H. Rep. No. 95–1153, 95th Cong., 2d Sess., at 63–66 (1978). These squabbles substantiate the inference that, if the 1975 amendments were intended to require mandatory implementation, some discussion in the reports would have arisen at the time of passage.

The amendments presently under legislative consideration also indicate that at least the current Congress does not interpret the statute as presently written to provide for mandatory implementation. Indeed, the Senate described the 1975 enactment of § 1773(g) thus: "Since the inception of the school breakfast program, Congress has taken legislative initiatives to increase the accessibility of this program to children. In 1975, Congress expressed its support and awareness of the need of this program in [§ 1773(g)]." The 1978 Senate Committee decided to continue promotion of the program through increased incentives rather than mandatory implementation. It is for Congress, not this Court, to weigh the cost to local educational autonomy against the benefit of guaranteeing hungry children a nutritious morning meal. Whatever Congress' considered judgment in 1978, the

1975 legislature did not opt for mandatory implementation.[2]

Plaintiffs argue that to construe § 1773(g) to not require mandatory implementation makes the section mere surplusage. Clearly, Congress intended by the 1975 amendments to launch a new initiative for expansion of the breakfast program. Written replies from state educational directors to the Select Committee's questions on why the breakfast program had failed to equal the lunch program, suggested as causes, in addition to scheduling problems and the attitude that breakfast was the family's responsibility, that the morning meal is undervalued in America generally. Many recommended a strong, federal informational campaign on the importance of breakfast and increased financial support for added administrative costs. Select Committee, Working Paper, *supra* (1975). § 1773(g) is a reasonable legislative response to these suggestions that cannot be denigrated as mere surplusage.

Finally, although deference to an administrative agency's interpretative regulations is inappropriate if inconsistent with the Statute's directives, it is particularly significant here that the Secretary of Agriculture did not interpret § 1773(g) to establish mandatory implementation. By the terms of § 1773(g), the Secretary was directed to and did report to the pertinent congressional committees his plans for expansion. These plans did not include mandatory implementation, yet plaintiffs have not suggested that these plans were rejected by the oversight committees.

## II.

However, a non-mandatory program does not render the federal agency responsible for the program's administration a mere bureaucratic repository for worthless state plans and an indiscriminate dispensary of federal funds without any review of whether Congress' commitment was being fulfilled by the states receiving those funds. Plaintiffs charge that the USDA has become just that, by failing to require certain information vital to the congressional scheme and by approving all state plans, no matter how deficient in either expressed commitment to or actual implementation of expansion in needy schools or in information required by statute or regulation. As a consequence, plaintiffs claim the federal agency has totally failed to carry out § 1759a(e)(1)(C), which provides:

> Each year by not later than a date specified by the Secretary, each State educational agency shall submit to the Secretary, for approval by him as a prerequisite to receipt of Federal funds or any commodities donated by the Secretary for use in programs under this chapter and the Child Nutrition Act of 1966, a State plan of child nutrition operations for the

---

**2.** Although many of the statements cited by plaintiffs support implementation in all schools receiving Title I funds or where 25% of the pupils are eligible for free or reduced-price meals, some congressmen expressly limited mandatory implementation to those school districts already receiving federal feeding funds. *E. g.,* 121 Cong. Rec. 29305 (1975) (remarks of Rep. Chisholm); 121 Cong. Rec. 29307 (1975) (remarks of Rep. Zeferetti). This more limited requirement retains voluntary election to participate in either the lunch or breakfast programs by the local school district governing authority. But having so elected, as a condition of receiving funds, the school district would be required to institute breakfast programs in all needy schools in the district.

Such a scheme would be consistent with *Torres v. Butz,* 397 F.Supp. 1015 (N.D.Ill.1975), wherein the court construed the breakfast program statute and regulations (prior to the 1975

amendments) to require a local district having elected to participate, to apply on behalf of all needy children in the district and to require a state educational agency to reject any application deficient in that respect. *Cf. Justice v. Board of Education,* 351 F.Supp. 1252 (S.D.N.Y. 1972); *Davis v. Robinson,* 346 F.Supp. 847 (D.R.I.1972); *Shaw v. Governing Body of Modesto City School District,* 310 F.Supp. 1282 (E.D.Cal.1970). But *cf. Richmond v. Snodgrass,* 525 F.2d 197 (9th Cir. 1975); *Briggs v. Kerrigan,* 431 F.2d 967 (1st Cir. 1970) (per curiam), *aff'g,* 307 F.Supp. 295 (D.Mass.1969). (all cases involve lunch program).

Plaintiffs have not advanced the narrower interpretation that mandatory implementation is limited to school districts that have already elected to participate in feeding programs. Indeed, other than a few statements on the floor, there is no support in the legislative history for this gloss.

following school year, which shall include, as a minimum, a description of the manner in which the State educational agency proposes (C) to use the funds provided under section 1761 of this title and section 1773 of this title and funds from sources within the State to the maximum extent practicable to reach needy children.

The USDA heads a three-tier structure of responsibility for administration of the program. At the local level, the school district governing body or "School Food Authority", 7 C.F.R. § 220.2(w), administers the program in the participating schools in its area. The local body files an application to participate with the state educational agency on behalf of some or all of the schools in its area and contracts with the state agency according to state and federal requirements. Local or state law may determine which schools participate; some state statutes make breakfast programs mandatory,[3] while others base participation on the purely voluntary election by the individual school.[4] The application must contain information indicating the "extent of need for Program payments". 7 C.F.R. § 220.7.

The state educational agency is primarily responsible for monitoring compliance with he program by the participating local authorities. 7 C.F.R. § 220.13(j). In particular, the state agency must assist local authorities in meeting state objectives. § 220.13(f)(1). Under present regulations, these objectives must be identified in the state plan submitted by the state agency to USDA for approval, along with "(ii) the reasons for the establishment of the objectives, (iii) the methods to be used to accomplish the objectives, and (iv) evaluation methods to be used in determining if the objectives are being met." § 220.13(f)(2). To be consistent with the statutory requirement, those objectives must reflect use of federal funds "to the maximum extent practicable to reach needy children". USDA's own regulations are even stronger, imposing on state agencies "a positive obli-

gation . . . to extend the benefits of the School Breakfast Program to children attending schools in areas where poor economic conditions exist". 7 C.F.R. § 220.7(c). *Accord* 42 U.S.C. § 1773(c).

The Secretary of Agriculture is charged by Congress with prescribing "such regulations as he may deem necessary". 42 U.S.C. § 1779. As a prerequisite to federal funds, USDA must approve all state plans. § 1759a(e)(1). USDA establishes only general eligibility guidelines based on income and the minimum nutritional requirements of the breakfasts served. By its own regulations, USDA may disqualify a state agency or local authority from future funds "if it fails to comply with the provisions of this part and its agreement". 7 C.F.R. § 220.18. Pursuant to § 1773(g), the Secretary is directed, in cooperation with state agencies, to carry out a program of information and outreach to achieve the expansion imperative.

It is apparent from the statutory and regulatory scheme that the state plan is central to attainment of the congressional goal of expansion of the breakfast program to all needy schools. As such, the plan must be more than a "roadmap", a term suggested by a USDA official (Dickey Deposition at 79–80), which merely apprises USDA of the state's general ambitions. Rather, the plan must demonstrate to the satisfaction of USDA a detailed and concrete commitment by the state to use federal funds "to the maximum extent practicable to reach needy children". 42 U.S.C. § 1759a(e)(1)(C). The task of determining both the adequacy of the rate of expansion and the type of information and detail sufficient to enable the Secretary to determine adequacy was delegated by Congress to the Secretary. 42 U.S.C. § 1779.

As legislatively imposed limitations on the Secretary's delegated rule-making authority, plaintiffs cite the list of specific information required in state plans that various congressmen included in statements

---

**3.** *E. g.,* Massachusetts, Michigan, New York, Ohio, Texas.

**4.** *E. g.,* Alabama.

on the House and Senate floors.[5] Despite the tone of certainty and positive obligation of these statements, delegation of these administrative details to the Secretary is consistent with the legislation actually passed and typical of legislative reliance on agency expertise in these types of matters. In the one instance when Congress did intend inclusion of specific information in the state plan—the state's eligibility standard for higher reimbursement rates for schools in severe need—Congress explicitly acted to require that information. 42 U.S.C. § 1773(d) (1977).

■ Although the details were left to the Secretary's discretion, by statute, the Secretary must require information sufficient to determine if the state is using federal funds "to the maximum extent practicable to reach needy children". *See Ness Investment Corp. v. USDA*, 512 F.2d 706, 715 (9th Cir. 1975). At the present time, the Secretary has failed to require states to submit information sufficient to enable the federal agency to make a meaningful determination. The present regulations require only, in pertinent part:

(1) The number of schools not participating in the program, together with the average daily attendance in such schools;

(2) An estimate of the number of schools needing, but not participating in the school breakfast program under part 220 of this chapter, together with the average daily attendance in such schools;

(5) The detailed action program the state agency proposes to undertake to use Federal funds . . . to . . . (iii) extend the benefits of the school breakfast program to children in need of such benefits. 7 C.F.R. § 210.4b

As officials even admitted (Nelson Deposition at 34–35), the required information does not permit the agency to evaluate how many truly needy schools remain without a breakfast program because the state's definition of need is not also required. The proposed regulation that USDA has prepared but which Mr. Straus, Administrator of the Food and Nutrition Service of USDA and responsible for the administration of SBP, has decided not to issue at this time, does require the state's definition. For the present, however, the federal agency is in the dark with regard to 50% of the states' definitions. Examination of the definitions of the 50% who volunteered their definition in the 1977–78 plans only underlines the need for such information. The discrepancy of definitions reveals that a state can so define needy as to give a distorted impression that expansion is not as urgent as it may be in reality and in comparison to other states.[6] The significance of a state's definition has been recognized by Congress in the form of a legislated requirement that a state's definition of schools in severe need entitled to a higher reimbursement rate be included in the state plan and approved by the Secretary. 42 U.S.C. § 1773(d) (1977).[7]

5. *E. g.,* 121 Cong. Rec. 29305 (1975) (remarks of Rep. Chisholm) (definition and names of needy schools); 121 Cong. Rec. H3356 (daily ed. April 28, 1975) (remarks of Rep. Miller) (fixed timetable); 121 Cong. Rec. E2064 (daily ed. April 29, 1975) (remarks of Rep. Meeds) (explicit timetable); 121 Cong. Rec. E5362 (daily ed. Oct. 9, 1975) (remarks of Rep. Thompson).

6. Definitions of "needy" range from 10–50% of children in attendance who are eligible for free or reduced-price meals. (Plaintiffs' Exhibit 2).

7. Prior to Congress' action in 1977, plaintiffs also complained of USDA's failure to require a definition of schools in severe need, the vagueness of the Secretary's guidelines as to the content of the term, and the agency's approval

of all definitions, even if the definition resulted in the ineligibility of all schools in the state for higher reimbursement rates. USDA has subsequently counselled that a state's definition should not be overly exclusive and that approximately 20% of the state's schools should qualify. Straus' Affidavit (May 25, 1978). According to Mr. Straus, (Affidavit March 17, 1978), USDA has criticized states with unduly restrictive standards. But USDA has refused to set national eligibility criteria based on the sense that a state is in a better position to compare normal with unusually high cost of operations and percentages of children eligible for free or reduced-price meals. USDA's actions are consistent with the statute's requirements and should correct the significant past abuses plaintiffs noted.

As a substitute for a definition of needy, information about the schools needing but not participating in the breakfast program would assist the Secretary in his determination of whether the state is adequately expanding the program to needy schools. In specific, whether the schools needing but not participating in the program receive Title I funds and/or the percentage of children in attendance who are eligible for free or reduced-price meals would be indicative of the needy character of schools presently without breakfast programs. Comparison of that information for schools already participating would enable the Secretary to determine whether the states were expanding and according priority to needy schools, in compliance with the statute's and the Secretary's requirements, 42 U.S.C. § 1773(c); 7 C.F.R. § 220.7(c). This information is presently requested by USDA according to guidelines promulgated in April, 1977. (Defendants' Attachment A, filed Feb. 17, 1978). However, since the proposed regulations have not been issued, the information has not been required of states. At the very least, either a state's definition of needy or this information about the participating and non-participating schools must be required to give any effect to the statute's drive for expansion to needy schools and to the federal agency's duty to oversee the use of federal funds to that end.

The other omissions in plan requirements of which plaintiffs complain are not as indispensable. The regulations presently require states to submit a "detailed action program". 7 C.F.R. § 210.4b(5). Among other details, the regulations require a statement and explanation of state objectives and the state's methods designed to accomplish and evaluate progress toward those objectives. 7 C.F.R. § 220.13(f)(1). These regulations reflect the Secretary's deliberate choice to monitor only the state's express goals, supervisory methods, and state-wide progress, delegating primary responsibility for local compliance with program requirements by individual schools or school districts to the state agency. Nothing in the statute forbids this ordering of responsibility. Plaintiffs' suggestion that the names of individual schools targeted for expansion be included in state plans would unnecessarily involve the federal authority in the local compliance aspect. Plaintiffs also insist on inclusion of the number of schools targeted and an exact timetable for expansion. Under recent guidelines, the Secretary has in fact requested states to submit the number of schools targeted, (Defendants' Attachment A, filed Feb. 17, 1978), and the details of the information and outreach campaign planned by the state. (Straus' Affidavit, May 25, 1978). Response to the Secretary's request has been strong, with only two out of 56 1978 plans omitting the number of schools targeted for expansion in the coming year. Although plaintiffs' suggestions outline an effective way of guaranteeing expansion, the Court cannot impose on the Secretary any fixed formula or basic minimum content for a "detailed action plan". Suffice it to say, to satisfy the statutory mandate, the "detailed action plan" must diagram the state's campaign to expand the breakfast program to needy schools and must provide the Secretary with sufficient information to determine whether these efforts are "to the maximum extent practicable". The Court cannot say that a more exact timetable than the state's expansion plan for the coming year or the number of targeted schools are vital to the Secretary's determination.

Beyond a failure to require certain information, plaintiffs argue that the Secretary has approved state plans that violate both existing statutory and regulatory requirements. For example, at least four out of 56 state plans for 1978 did not include the number of schools needing but not participating in the school breakfast program.[8] In addition, according to plaintiffs, a number of plans either submitted trifling numbers of schools targeted for expansion in comparison to need[9] or indicated that more non-needy than needy schools were involved

---

**8.** Alabama, Arizona, South Carolina and Washington.

**9.** *E. g.*, Alabama, Colorado and Minnesota.

in the expansion drive.[10] Plaintiffs allege that, at least in prior years, all plans were approved, no matter how deficient in information or how lackadaisical about expansion. USDA has never invoked the ultimate sanction—withholding federal funds—for either inadequate plans or inadequate implementation of plans. Indeed, it is unclear if USDA ever evaluated actual implementation by the state agency level, subsequent to submission and approval of the state plan. Fundamentally, plaintiffs and defendants have a very different conception of the USDA's role in monitoring state plans. Plaintiffs urge a duty, unexercised to date by the Secretary, to withhold funds to states that fail to make or fulfill binding, detailed commitments to expansion to needy schools. Defendants regard the state plan more in the nature of a prediction rather than a commitment and grant unquestioning approval. Both views are wide of the mark.

Congress has required USDA approval of state plans as a prerequisite to federal funds. 42 U.S.C. § 1759a(e)(1). Although not explicitly provided by statute but consistent with the prerequisite language,[11] the Secretary has issued regulations permitting disqualification of states that fail to comply with statutory and regulatory requirements. 7 C.F.R. § 220.18. Merely because the power to disqualify exists, does not compel the Secretary to exercise it. Although potentially effective to force better state plans and implementation, the devastating effect on school children who have come to depend on a free or inexpensive nutritious morning meal counsels against the overuse of this ultimate sanction except in the most flagrant circumstances. Since expansion still depends on voluntary participation, see Part I, a state has not perpetrated a per se flagrant violation of its commitment to expand merely because the number of schools choosing to participate

has not dramatically increased from year to year. Cf. Woodruff v. Lavine, 417 F.Supp. 824, 827 (S.D.N.Y.1976).

■ Nonetheless, a state is under a statutory and regulatory mandate to conduct an aggressive outreach program, and give priority to needy schools. Anything less in either the plan or its subsequent implementation, see Tyson v. Norton, 390 F.Supp. 545, 555 (D.Conn.1975), triggers USDA's duty to take remedial action. See Marquez v. Hardin, 339 F.Supp. 1364, 1369 (N.D.Cal. 1969). This duty inheres in the congressional scheme which conditions funding on USDA's approval of plans that demonstrate use of funds "to the maximum extent practicable to reach needy children". 42 U.S.C. § 1759a(e)(1)(C). Consequently, USDA must undertake a variety of actions beginning with investigation and suggestions and escalating to interim approval conditioned on certain amendments, with the last resort measure of withholding federal funds. Lack of information is not an excuse for agency inaction; any levelling off or decrease, actual or expected, in the number of needy schools participating should trigger federal inquiry.

■ Whether the USDA has in fact taken remedial action in any form, particularly with regard to the more recent state plans, has not been fully canvassed at this pretrial stage. The depositions make clear that USDA has never withheld funds. However, plaintiffs have failed to establish that such inaction constitutes an abuse of discretion, violative of the statutory scheme. Further factual investigation at trial is necessary, see, e. g., Jones v. Board of Education, 474 F.2d 1232 (6th Cir. 1973); Briggs v. Kerrigan, 431 F.2d 967 (1st Cir. 1970), to determine what action short of withholding funds defendants have initiated in response to inadequate plans or inadequate implementation, and whether these

---

10. E. g., Alabama, Arizona, Florida, Idaho, Kentucky, Minnesota, New Hampshire, New Mexico, North Carolina, Puerto Rico and Tennessee.

11. Some doubt as to whether the sanction of withdrawing funds was intended is cast by the unwillingness of the current Congress to grant

this power to the Secretary under the legislation now under consideration. H. Rep. No. 95–1153, 95th Cong., 2d Sess. at 27 (1978). However, unlike the present context, the rejected sanction would have addressed a state's failure to comply with proposed mandatory establishment of the breakfast program.

remedial actions, if any, are so inadequate as to be tantamount to an abuse of discretion or a total failure to observe the duty to monitor state expansion drives. *See City of Hartford v. Town of Glastonbury,* 561 F.2d 1032, 1043 (2d Cir. 1976), *rev'd en banc on other grounds,* 561 F.2d 1048 (1977); *Bennett v. Butz,* 386 F.Supp. 1059, 1065 (D.Minn.1974). *Cf. Save the Bay Inc. v. Administrator of E.P.A.,* 556 F.2d 1282 (5th Cir. 1977) (judicial review of agency's failure to take remedial sanctions).[12] Inadequacy of plans, implementation and remedial action must be judged in light of the circumstances in a particular state. The exchange of briefs, affidavits and exhibits indicate considerable dispute as to the content of the plans[13] and the explanations of their deficiencies.[14]

In conclusion, plaintiffs' motion for summary judgment is granted in part. The Court orders the Secretary to issue regulations requiring states to include in state plans their definition of needy schools and/or information regarding participating and non-participating schools' receipt of Title I funds and/or percentage of children in attendance who are eligible for free or reduced-price meals. *See, e. g., Tyson v. Morton,* 390 F.Supp. at 574–76; *Bennett v. Butz,* 386 F.Supp. at 1071–72 (examples of court-ordered promulgation of regulations consistent with statute). The Secretary may require either or both the definition of needy schools or this information concerning participating and non-participating schools. The proper procedure for promulgation must be followed. Insofar as we have held in this opinion, defendants' motion for summary judgment is granted regarding mandatory implementation and plaintiffs' demand that specific information other than that ordered, *supra,* be required in state plans. Both parties' motions are denied with respect to USDA's alleged failure to monitor state plans. A trial date will be set in the future to try this issue only.

---

12. Although neither party has raised the question of the Court's jurisdiction, the Court notes that jurisdiction to review an abuse of discretion by a federal agency lies under 28 U.S.C. § 1331. The jurisdictional amount is no longer required when suit is brought against federal officers. Although that amendment was passed subsequent to the filing of this suit, retroactive effective has been given, *e. g., Ostrer v. Aronwald,* 434 F.Supp. 379, 384–85 (S.D. N.Y.1977); *Green v. Philbrook,* 427 F.Supp. 834 (D.Vt.1977). Reviewability and the scope of review are governed by the Administrative Procedure Act, 5 U.S.C. § 706. Jurisdiction also lies under the mandamus statute, 28 U.S.C. § 1361, to order the Secretary to carry out his duty to monitor state plans. *See Commonwealth of Pa. v. Nat'l Ass'n of Flood Insurance,* 520 F.2d 11, 26–27 (3d Cir. 1975); *Johnson v. County of Chester,* 413 F.Supp. 1299, 1308

(E.D.Pa.1976). See generally *Davis Ass'n v. Sect'y HUD,* 498 F.2d 385 (1st Cir. 1974).

13. *E. g.,* Delaware, Oklahoma. Only analyses, not copies of the 1977–78 plans themselves, were attached as exhibits to the summary judgment motion.

14. For example, plaintiffs call USDA to task for approving the District of Columbia's plan which targets zero schools for expansion. USDA counters that the District, by law, requires all schools to participate, therefore no expansion is required. A second example is the South Carolina 1978 plan which indicates a decrease of 205 participating schools. Rather than a dismal failure, USDA attributes the decline to the repeal of the state law mandating breakfast programs in every school.