Henry CHARETTE, Jr., et al.

v.

Bob BERGLAND, Secretary of U.S. Department of Agriculture, et al.

Civ. A. No. 76–0145.

United States District Court, D. Rhode Island.

Oct. 16, 1979.

MEMORANDUM AND ORDER

PETTINE, Chief Judge.

For over three years, this Court has witnessed an active and extensive lawsuit alleging that the United States Department of Agriculture (U.S.D.A.) has failed miserably in enforcing the federal School Breakfast Program, National School Lunch Act & Child Nutrition Act, 42 U.S.C. §§ 1751 *et seq.* The lawsuit was brought by a nationwide class of needy children who are eligible for free or reduced-price breakfasts and lunches under the federal program; various officials of the U.S.D.A. were named defendants. Recently, these two parties negotiated a proposed consent decree which would settle the lawsuit. This proposed settlement is now before the Court for its approval; in the interim, however, it has been attacked by various objectors [1] and the very named plaintiffs who initially negotiated this proposed compromise. In light of the current state of disagreement, the Court must determine whether to accept the current version of the consent decree.

A short procedural history is necessary to understand the present controversy. In rudimentary terms, the Child Nutrition program is essentially a federal-state cooperative effort in which federal funds are conditioned upon the receipt of an adequate state plan detailing the methods in which the state intends to expand its school nutritional programs to reach more needy children.[2]

John M. Roney, Providence, R.I., Lorelei Borland, Ronald Pollack, Roger Schwartz of the Food Research and Action Center, Inc., New York City, for plaintiffs.

Paul F. Murray, U.S. Atty., Providence, R.I., Elisa B. Vela, Dept. of Justice, C.D., Bonnie Lukin, Dept. of Agriculture, Washington, D.C., for defendants.

1. The objections filed to the proposed consent decree are numerous. They come from various advocacy groups in several states, including Pennsylvania, Utah, the District of Columbia, Virginia, Colorado, Mississippi, and Tennessee.

2. A detailed description of the federal school breakfast and lunch nutritional program is set forth in this Court's prior opinion in this case, *Charette v. Bergland*, 457 F.Supp. 1197 (D.R.I. 1978). For the purposes of this opinion it is sufficient merely to note the statutory framework of the federal program.

42 U.S.C. § 1759a(e)(1) states:

Each year by not later than a date specified by the Secretary, each State educational agency shall submit to the Secretary, for approval by him as prerequisite to receipt of Federal funds or any commodities donated by

the Secretary for use in programs under this chapter and the Child Nutrition Act of 1966, a State plan of child nutrition operations for the following school year, which shall include, as a minimum, a description of the manner in which the State educational agency proposes . . . (C) to use the funds provided under section 1761 of this title and section 4 of the Child Nutrition Act of 1966 and funds from sources within the State to the maximum extent practicable to reach needy children.

[42 U.S.C. § 1759a(e)(1)(C)]

In short, the statute requires the Secretary of Agriculture to issue regulations (1) setting a date for plan submission; (2) making sure that the plan covers the entire school year; and (3) establishing the details required to insure that the available monies are being used "to the

On earlier cross motions for summary judgment, this Court interpreted the federal Child Nutrition statute and the applicable regulations and granted both sides partial summary judgments. *Charette v. Bergland*, 457 F.Supp. 1197 (D.R.I.1978). The Court denied summary judgment motions on the issue of whether U.S.D.A. had accepted inadequate plans and/or failed to monitor implementation of state plans. These issues required important factual determinations that could only be decided at trial. *Id.* at 1207.

Armed with their respective judgments, both sides attempted to negotiate a solution. The parties were apparently successful and submitted a detailed consent decree for this Court's approval. Such moments of compromise and agreement, while always gratifying to a court, are often fleeting. So it is in this case. Shortly after notification of the proposed consent decree was made, numerous advocacy groups filed notices of opposition. Claiming to have been misled or mistaken when negotiating the consent decree, the named plaintiffs now also wish to withdraw from or modify the decree. Only the U.S.D.A. remains content with the document and argues that it should be entered as in the best interests of all the parties.

The bone of contention in all the filed objections is paragraph 2 of section B in the consent decree. Section B details the responsibilities of the defendant U.S.D.A.; paragraph 2 of that section reads:

Any state plan submitted to defendants which does not meet the requirements of

maximum extent practicable to reach needy children."

In 1977, Congress enacted an additional requirement—that the states must include in the state plan their definition of a school in "severe need" for reimbursement purposes. 42 U.S.C. § 1773(d). In 1978, Congress further amended this statute, setting forth certain minimal requirements for such definitions. This statute reads:

Each State educational agency shall establish eligibility standards for providing additional assistance to schools in severe need, which shall include those schools in which the service of breakfasts is required pursuant to State law and those schools (having a breakfast program or desiring to initiate a breakfast program) in which, during the most recent second preceding school year for which lunches were served, 40 percent or more of the lunches served to students at the school were served free or at a reduced price and in which the rate per meal established by the Secretary is insufficient to cover the costs of the breakfast program. Such eligibility standards shall be submitted to the Secretary for approval and included in the State plan of child nutrition operations required by section 1759a(e)(1) of this title. *Id.*

To implement these statutory requirements in the School Breakfast Program, USDA has issued certain regulations:

(a) Not later than May 15 of each year, each State agency shall submit to FNS for approval a State Plan of Child Nutrition Operations for the following school year. Approval of the plan by FNS shall be a prerequisite to the payment of cash assistance funds to the State agency under the act of the Child Nutrition Act of 1966, as amended, or to the donation by the Department of any commodities under part 250 of this chapter for use in schools and service institutions.

(b) A State plan of child nutrition operations, as a minimum, shall include the following information:

(2) An estimate of the number of schools needing, but not participating in, the school breakfast program under part 220 of this chapter, together with the average daily attendance in such schools;

(4) Estimated funds, other than Federal funds, available to and under the control of the State agency for use in financing the program under the act and the Child Nutrition Act of 1966, as amended;

(5) The detailed action program the State agency proposes to undertake to use the Federal funds provided under this act and the Child Nutrition Act of 1966, as amended, and other funds available to and under the control of the State agency to: . . . (iii) extend the benefits of the school breakfast program to children in need of such benefits;

. . . (d) The State agency may submit for approval a revised plan of child nutrition operations, or amendments to its approved plan, at any time.

(e) State agencies may require school food authorities to submit for their approval similar plans for child nutrition operations for the schools under the jurisdiction of such school-food authorities.

(f) The State agency shall give the Governor or his delegated agency, the opportunity to comment on the relationship of the State Plan to comprehensive and other State plans and programs and to those of affected area-wide or local jurisdictions. A period of 45 days from the date of receipt of the State Plan shall be afforded to make such comments. 7 C.F.R. § 210.4a.

paragraph B1 above, may be given conditional approval. This conditional approval shall specify that the missing information will be supplied by a specific date set by the defendants, but in no case later than the commencement of the fiscal year in question. Failure to supply the missing information by the specific date will result in the withdrawal of conditional approval.

The plaintiffs argue that on its face, this language allows U.S.D.A. to grant conditional approval to any state plan, even if it is totally inadequate, up to three months, or one full quarter of the plan year.

The basis of this controversial paragraph is the idea of "conditional" or "interim" approval of an inadequate state plan by the U.S.D.A. The concept of interim or conditional approval was referred to in this Court's earlier opinion. The Court noted that:

a state is under a statutory and regulatory mandate to conduct an aggressive outreach program, and give priority to needy schools. Anything less in either the plan or its subsequent implementation, triggers U.S.D.A.'s duty to take remedial action. This duty inheres in the congressional scheme which conditions funding on U.S.D.A.'s approval of plans that demonstrate use of funds "to the maximum extent practicable to reach needy children." 42 U.S.C. § 1759a (e)(1)(C). Consequently, U.S.D.A. must undertake a variety of actions beginning with investigation and suggestions and escalating to interim approval conditioned on certain amendments, with the last resort measure of withholding federal funds. Lack of information is not an excuse for agency inaction; any levelling off or decrease, actual or expected, in the number of needy schools participating should trigger federal inquiry.

457 F.Supp. at 1206–07 (citations omitted).

Based on this language U.S.D.A. issued a Memorandum to the Food and Nutrition Service of U.S.D.A. (FNS) by which "conditional approval" is to be given to any plan which contains the signature of the State Director and the Chief State School Officer and has passed the gubernatorial process. In short, as plaintiffs state, "a plan will not be initially received for adequacy or commitment, but only for proper signatures."

Plaintiffs do not attempt to relitigate this Court's prior holding and currently agree with the concept of conditional approval. Plaintiffs, however, vigorously disagree with the method in which the defendants have utilized such a conditional approval of funds. Plaintiffs claim, and defendants concede, that conditional approval is granted and monies disbursed for any state plan which contains the signature of the State Director and the Chief State School Officer and has passed the gubernatorial review process. Thus, state plans that are properly signed and approved at the state level are eligible for conditional approval even if they completely lack any of the information required by federal statutes and regulations.[3] Such conditional approval, plaintiffs argue, only requires the proper signatures, not the proper substance, and may result in dispensing federal funds to a totally inadequate state plan for up to three months. Both sides agree that woefully inadequate state plans have received such conditional approval.[4] Such a course of action, plaintiffs conclude, is unfair, contrary to this Court's earlier opinion, and impermissible under the current regulations and statutes.

The U.S.D.A. counters that this approach to conditional approval insures that the existing nutritional programs will continue for a limited period during which the federal government may work closely with a

---

**3.** This conditional approval process was set forth in a U.S.D.A. memorandum to the regional agency offices dated February 21, 1979 and signed by Margaret Glavin, Director of the School Programs Division of U.S.D.A.

An example of some of the information required by federal law as a prerequisite to funding is found in note 2, *supra*.

**4.** The Pennsylvania state plan is cited as an example of an inadequate state plan which received conditional approval. After granting conditional approval, the U.S.D.A. sent a six page letter that listed numerous areas in which the state had failed to provide the information required by federal law.

state submitting inadequate information in hopes that the state may create an acceptable, fully documented nutritional program for needy children. Under the consent decree, defendants argue, this conditional funding and federal-state cooperation is of limited duration; if a state has not supplied all the information required in the consent decree by October 1st (the commencement of the fiscal year), then "the last resort measure of withholding federal funds" is automatically invoked. U.S.D.A. also notes that both sides compromised and fully agreed upon the language of the proposed consent decree, language that plainly permits this conditional funding approach. Thus, defendants conclude, plaintiffs should be held to this fair compromise and, therefore, the consent decree should be approved and entered.

Perhaps if this were not a nationwide class action, the named plaintiffs should not be allowed to retract from the proposed decree upon which they compromised. For undetermined reasons, however, the named plaintiffs now join various objectors in opposing the "conditional approval" section of the decree. An anomalous situation therefore confronts this Court: a proposed consent decree is properly before the Court for its approval, yet there appears precious little agreement or contentment over this proposed settlement. In such a situation, the Court must be particularly alert to guard the interest of all parties affected by this lawsuit and carefully scrutinize the fairness of the proposed decree.

In light of the current disagreement, this Court finds the conditional approval section of the proposed consent decree inadequate. The inadequacy stems from the fact that the conditional approval provision contemplates such approval when vital information has not yet been submitted. This Court's sanction of the use of conditional approval never embodied the indiscriminate dispensing of Federal funds without any review of whether Congress' commitment was being fulfilled by the state receiving the fund. I outlined a procedure whereby U.S.D.A. was to begin with investigation and suggestions and escalate to interim approval; not to begin with conditional approval and then

offer suggestions. Specifically the Court stated as to each state's outreach program, "the USDA must undertake a variety of actions beginning with investigation and suggestions and escalating to interim approval conditioned on certain amendments, with the last resort measure of withholding federal funds." 457 F.Supp. at 1206. These enforcement tools can be used to supervise and improve the substance of each state's program only if the U.S.D.A. has a full supply of information from which to make an evaluation. Put simply, the submission of adequate information on the state plans is a prerequisite for investigation and conditional approval. As this Court emphasized: the "[l]ack of information is not an excuse for agency inaction . . . ." *Id.*

Conditional approval is an appropriate course to use when the federal agency is investigating, digesting and evaluating the state's plan, i. e., when the necessary information is submitted to the U.S.D.A. As discussed in this Court's earlier opinion, Congress desired the Secretary to utilize his discretion in evaluating and approving the individual state plans; but, this discretionary determination was to be an informed one. Congress did require that the state plan was to contain certain minimum amounts of information "as a prerequisite to receipt of Federal funds . . . ." The minimum information required included "a description of the manner in which the State educational agency proposes" to conduct its outreach program "to the maximum extent practicable to reach needy children." 42 U.S.C. § 1759a(e)(1)(C). Descriptions of schools in "severe need" were later required. 42 U.S.C. § 1773(d). The U.S.D.A.'s own regulations have also set forth certain minimal information demands. *See* 7 C.F.R. § 210.4a. Informed investigation, enforcement and approval can only begin when a significant portion of this information has been received. *See Torres v. Butz,* 397 F.Supp. 1015, 1023 (N.D.Ill.1975). The enforcement steps of investigation, evaluation, and interim approval would be empty and meaningless exercises if the plans received solely contained the proper signatures. It is difficult to define an agency's

grant of conditional approval as an informed and reasoned administrative decision when that agency has yet to receive the minimum required information for its consideration.

Once the information is submitted, serious defects may be revealed; yet, armed with this information, the federal agency may evaluate the inadequacies and work with the state to improve the submitted plans. It is at this point that the practice of conditional approval becomes important if not invaluable.

Aside from concerns over the legality of the proposed conditional approval scheme, this Court also doubts that, as a practical matter, such a practice would lead to the fair and efficient enforcement of the federal standards. Although the Court has no reason to doubt the good faith of the U.S. D.A., the grant of conditional approval as a step in merely obtaining the required information would considerably delay any actual enforcement of the substantive aspects of the nutritional program. The grant of conditional approval awaiting information could well be followed by a grant of conditional approval pending review and improvement of the substantive aspects of the state plan.[5] Such a scenario of consecutive grants of conditional approval may well continue through most of the school year; only to be repeated in the next year. It is

true that this practice avoids the "last resort" of cutting off federal funds; yet, this protracted process also deprives the school children of effective evaluation and enforcement throughout most of the school year.

This possibility of delay and the phrasing of the applicable statutes and regulations causes this Court to reject the present disputed consent decree. Granting conditional approval before receiving any of the required minimum information for evaluation and review strikes this Court as a controversial and questionable practice that may contravene the letter and spirit of the enforcement provisions contained in the federal statutes.[6] Cf. *State of West Virginia v. Charles Pfizer & Co.*, 440 F.2d 1079 (2d Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971) (evaluation of decree includes points of law upon which settlement is based). This Court's decision not to accept the proposed settlement is further supported by the fact that a large portion of the class, including the named plaintiffs, oppose the current settlement. See *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3rd Cir. 1974), cert. denied, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1979). In declining to approve the consent decree, this Court is not holding that the proposed conditional approval scheme is necessarily illegal or improper. This Court merely

---

5. Under the decree's version of conditional approval, the following protracted and ineffectual scenario easily could occur: adequate information is not received from the state until October 1st, during which time conditional approval was granted in accordance with the proposed decree; then, the substantive evaluation and verification of the information begins, followed by extensive correspondence and discussion between state and federal officials. These cooperative efforts that aim at bringing the merits of each state plan in line with federal requirements are certainly praiseworthy; however, this bureaucratic process of evaluation, negotiation and clarification may, conservatively predicted, last through a major portion of the school year if it is only to begin October 1st. As this Court noted in its earlier opinion, conditional approval would be properly granted during this substantive evaluation period.

In contrast, 7 C.F.R. § 210.4a sets May 15 of the previous fiscal year as the deadline for the submission of the required information. The process of enforcement would not appear to be

thwarted if substantive review of the state plans could begin at that early date.

6. This Court rejects the present conditional approval paragraph due to the controversial and questionable nature of the practice and the inherent risk that such a practice may not be in the best interests of the class. Were there more agreement amongst the parties as to this practice, the Court might be persuaded to accept the proposed decree. As the Second Circuit has noted: "[t]he very purpose of a compromise is to avoid the determination of sharply contested and dubious issues . . . ." *In re Prudence*, 98 F.2d 559, 560 (1938). See also *Greenspun v. Bogan*, 492 F.2d 375 (1st Cir. 1974). Yet, the present vociferous disagreement amongst all parties to the so-called consent decree belies any theory of compromise settlement in which each party is freely "surrendering something in order to prevent unprofitable litigation . . . ." *Greenspun v. Bogan*, 492 F.2d at 381.

finds that such a questionable and controversial practice may not be in the best interest of all the parties in this action. *See* 7A Wright & Miller § 1797 at 229 (1972) (and cases cited therein). Therefore, paragraph 2 of section B in the proposed consent decree is not approved. I agree with the plaintiffs that the language must be modified. Since the remainder of the proposed decree appears perfectly satisfactory, it will be entered if the parties can arrive at a satisfactory compromise on the issue of conditional approval. If the language cannot be satisfactorily modified by the parties, then, of course, the entire agreement must be abandoned.

This case has reached the point where it must be concluded. All future action will be accomplished on a time designated basis. Therefore, the parties will meet and attempt to resolve their differences, reporting to the Court the result of their conference on or before November 5, 1979.

So ordered.[7]

---

7. *See* 457 F.Supp. 1197 (D.R.I.1978) for original opinion.